THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AJAX GAMING VENTURES, LLC and THE TOWN OF JOHNSTON, Plaintiffs | : | CA 06 336 |
| v. | : | C.A. No. 06- |
| MATTHEW BROWN, in his capacity as SECRETARY OF STATE for the STATE OF RHODE ISLAND, Defendant | : | |

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUCTION**

Plaintiffs Ajax Gaming Ventures, LLC and the Town of Johnston, pursuant to Federal Rule of Civil Procedure 65, hereby move this Court for an order temporarily restraining and preliminarily enjoining Defendant Matthew Brown, in his capacity as Secretary of State for the State of Rhode Island, from taking any action to submit to the voters of the State at the November 2006 General Election the question of whether to approve an amendment to the Rhode Island Constitution to permit casino gaming as proposed in General Assembly Joint Resolution No. H 7935/Sub A. In support of this motion, Plaintiffs rely on their Verified Complaint and Memorandum of Law submitted herewith.

AJAX GAMING VENTURES, LLC and
THE TOWN OF JOHNSTON,

By their Attorneys,

Shechtman Halperin Savage, LLP

Preston W. Halperin, R.I. Bar No. 5555
Douglas A. Giron, R.I. Bar No. 2943
1080 Main Street
Pawtucket, RI 02860
(401) 272-1400
(401) 272-1403 (fax)

Dated: July 21, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of July 2006, I have caused a true and accurate copy of the within Verified Complaint, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, and Memorandum in Support thereof, to be served via CONSTABLE upon the following:

Matthew Brown, in his capacity as Secretary of State for the State of Rhode Island
82 Smith Street
State House Room 217
Providence, RI 02903

Patrick J. Lynch, Attorney General
150 South Main Street
Providence, RI 02903

Danielle M. Smith

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AJAX GAMING VENTURES, LLC and THE TOWN OF JOHNSTON, Plaintiffs | : | |
| v. | : | C.A. No. 06- CA 06 336 |
| MATTHEW BROWN, in his capacity as SECRETARY OF STATE for the STATE OF RHODE ISLAND, Defendant | : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

This matter is before the Court on the motion of Plaintiffs Ajax Gaming Ventures, LLC ("Ajax") and the Town of Johnston (the "Town"), pursuant to Federal Rule of Civil Procedure 65, for an order temporarily restraining and preliminarily enjoining Defendant Matthew Brown, in his capacity as Secretary of State for the State of Rhode Island (the "State"), from taking any action to submit to the voters of the State at the November 2006 General Election the question of whether to approve an amendment to the Rhode Island Constitution to permit casino gaming as proposed in General Assembly Joint Resolution No. H 7935/Sub A (the "West Warwick Resolution"). Plaintiffs have filed a Verified Complaint alleging that the Proposed West Warwick Resolution violates the Fourteenth and First Amendments to the federal constitution, and now submit this Memorandum in support of their prayer for a temporary restraining order and preliminary injunction.

*Background*

As set forth in detail in Plaintiffs' Verified Complaint submitted herewith, on or about June 1, 2006, the Rhode Island General Assembly approved a Joint Resolution to submit to the

voters of the State at the November 2006 General Election the question whether the State Constitution should be amended by approving the West Warwick Resolution. The proposed West Warwick Resolution would authorize the establishment of a single resort casino in the Town of West Warwick (the "Casino"), to be privately owned and privately operated by an entity established by the Narragansett Indian Tribe (the "Tribe") and "its chosen partner," to be regulated and taxed by the State, with all tax proceeds to go to property tax relief. Although the Tribe has steadfastly refused to disclose the terms of its agreement with its "chosen partner," including the identity thereof, it is widely and publicly known and acknowledged that said chosen partner is Harrah's Entertainment.

The West Warwick Resolution would confer in the State Constitution a valuable right – the monopoly to own and operate the sole resort casino in the State – upon an entity to be formed by an Indian Tribe and a private gaming company, to the exclusion of all others, regardless of the existence of more suitable interested owner/operators capable of developing a facility that would produce greater revenues for the taxpayers of the State. Similarly, the proposed West Warwick Resolution pre-selects the location for the casino, to the exclusion of all other municipalities in Rhode Island that may be interested in hosting a resort casino, without any regard for whether there may be other, more suitable locations capable of producing greater revenues for the taxpayers of the State. Such discriminatory treatment denies equal protection in violation of the Fourteenth Amendment to the federal constitution, in that it treats one person differently than it treats other, similarly-situated persons. Because such proposed West Warwick Resolution is plainly unconstitutional, this Court should restrain and enjoin the Secretary of State from causing the proposed ballot question to appear on the ballot at the November 2006 General Election.

## *Argument*

A. <u>The Court Should Grant An Injunction So That The Voters Will Not Be Required To Consider An Unconstitutional Proposed Amendment</u>.

Even though the West Warwick Resolution is a proposal to amend the State Constitution, and has yet to become law, the Court has the authority to enjoin its consideration. In this regard, it is appropriate for a court to enjoin the submission of a ballot question proposing an amendment to a state constitution, where the proposed amendment would constitute a "plain and palpable" violation of the federal constitution, and would "inevitably be futile and nugatory . . . ." In *Stumpf v. Lau*, 108 Nev. 826, 831, 839 P.2d 120, 123 (Nev. 1992), the Nevada Supreme Court held as follows:

> When a proposal is obviously unconstitutional, permitting a vote on the matter will lead only to the creation of false hope, and if passed, eventual anger and disillusionment when the measure is declared unconstitutional. It is *far better to "bite the bullet" now, strike the measure from the ballot, and avoid the expense and any false expectations for the proposal.*

*Id.*, 839 P.2d at 123 n. 3 (emphasis added).

Similarly, in *R.A. Gray, Secretary of State v. Francis B. Winthrop, et al*, 115 Fla.721;727, 156 So. 270, 272 (1934), the Florida Supreme Court held that:

> If a proposed amendment to the State Constitution by its terms specifically and necessarily violates a command or limitation of the Federal Constitution, a ministerial duty of an administrative officer that is a part of the prescribed legal procedure for submitting such proposed amendment to the electorate of the State for adoption or rejection, may be enjoined at the suit of proper parties in order to avoid the expense of submission, when the amendment, if adopted, would palpably violate the paramount law and would inevitably be futile and nugatory and incapable of being made operative under any conditions or circumstances.

Id., 156 So. 270 at 272; see also *John Cobb v. State of Montana*, 278 Mont. 307, 924 P.2d 268 (1996).

Indeed, the Rhode Island State Supreme Court has acknowledged the propriety of court intervention to prevent voter consideration of unconstitutional legislation. In its 2004 advisory opinion to the Governor declaring the 2004 Casino Bill to violate the state constitution, which the court rendered before the referenda questions were to be submitted by the Secretary of State, the Supreme Court of Rhode Island stated that

> The issues raised in the Governor's request are of great public and constitutional importance. The Casino Act calls for placing the referendum question on the statewide ballot. The Governor's request asks whether the Casino Act and its requirement that the ballot question be submitted to the voters pass constitutional muster. If, as we believe, the question and legislation are void as unconstitutional, then *the members of the public will waste much money, time, effort, and energy to familiarize themselves with the controversial issues that the proposed casino has raised.* This confusion certainly will be intensified by the fact that the Governor and the Attorney General, two general officers of this state, expressly have taken the position that the Casino Act is constitutionally infirm.

*In re Advisory Opinion to the Governor*, 856 A.2d 320, 325 (R.I. 2004)(emphasis added).

Likewise, because the West Warwick Resolution, as explained below, plainly violates the federal Equal Protection Clause, this Court has a duty to subject it to substantive scrutiny now, rather than allowing the West Warwick Resolution to go to a vote, in order to avoid the expense and any false expectations for a constitutionally infirm proposal. Moreover, because the proposed casino is such a controversial issue of public importance, and because the plaintiffs would suffer real and immediate injury by allowing this constitutionally infirm proposal to go to a vote, the Court should enjoin its submission until and unless its substance passes constitutional muster. The risk of harm that would be caused by refusing jurisdiction and allowing an unconstitutional measure to go to a public vote would be far greater than undertaking a pre-vote review now to ensure the substantive constitutionality of the proposed amendment.

B. The Temporary Restraining Order/Injunction Standard.

This Court has ruled that the "standard to be applied to determine whether to issue a temporary restraining order is identical to the standard applied for preliminary injunction." *Kellam v. Burnley*, 673 F. Supp. 71, 72 (D.R.I. 1987)(citing *Palmigiano v. Travisono*, 317 F. Supp. 776, 787 (D.R.I. 1970)). In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction: "(i) that plaintiff will suffer irreparable injury if the injunction is not granted; (ii) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (iii) that plaintiff has exhibited a likelihood of success on the merits; and (iv) that the public interest will not be adversely affected by the granting of the injunction." *LeBeau v. Spirito*, 703 F.2d 639, 642 (1st Cir. 1983). In this case, Plaintiffs are able to satisfy such criteria.

C. Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.[1]

*1. Violations of Fourteenth Amendment*

Under the federal Equal Protection Clause,[2] the State cannot treat one person differently than it treats other, similarly-situated persons. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). As demonstrated below, in the context of State regulation of economic activities that occur off tribal land, the Tribe is similarly situated to every other person in the State. Thus, by granting the Tribe and its chosen partner a monopoly to own and operate the proposed Casino,

---

[1] The issues addressed in this Section C of this Memorandum (concerning the Fourteenth Amendment Violations) were extensively briefed by Lincoln Park, as an amicus party, in connection with the consideration by the Supreme Court of Rhode Island in 2004 of the Governor's request for an advisory opinion as to the constitutionality of chapter 9.1 of Title 41 of the Rhode Island General Laws, entitled "The Rhode Island Gaming Control and Revenue Act" (the "Casino Act"), which provided comprehensive guidelines for a casino operation. Lincoln Park's amicus brief, which was authored by Gerald DeMaria, Esq. and James Ruggieri, Esq. of the law firm of Higgins Cavanagh & Cooney, contains an excellent discussion and analysis of the equal protection issues, especially with regard to the involvement of an Indian Tribe. Plaintiffs have substantially adopted Lincoln Park's arguments herein (with minor alterations to accurately identify parties and issues in this case).

[2] The Equal Protection Clause of Amendment XIV, Section 1 of the Constitution of the United States provides as follows: "nor shall any State. . . deny to any person within its jurisdiction the equal protection of the laws."

the Proposed West Warwick Resolution would deny other persons equal protection, including the Plaintiff Ajax. In addition, by proposing to locate the Casino in West Warwick, the Resolution would grant West Warwick more favorable treatment than the Town of Johnston, which would deny Johnston equal protection.

(a). The State Constitution Cannot Grant The Tribe Or Harrah's A Monopoly To Own/Operate A Casino.

In this case, the Tribe and its chosen partner would use private land, *not tribal land,* for the Casino. Thus, whatever special treatment might be permissibly accorded to the Tribe in connection with its use of tribal land would not apply to this case. Given that no tribal land would be involved and no federal legislation would be implicated, the standard that applies to the West Warwick Resolution's favorable treatment of the Tribe is strict scrutiny. Even if the rational basis test could apply, there is no rational basis for the West Warwick Resolution's treatment of the Tribe differently than it treats every other person in the State with respect to the use of non-tribal land.

(i). Strict scrutiny is the applicable standard.

"Social and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld . . . when the legislative means are rationally related to a legitimate governmental purpose." *Medeiros v. Atlantic States Marine Fisheries Comm'n*, 327 F. Supp. 2d 145, 151 (D.R.I. 2004) (citing *Hodel v. Indiana*, 452 U.S. 314, 331 (1981)(rational means test)). In contrast, a racial preference would violate equal protection guarantees unless it is "narrowly tailored" to further a "compelling governmental interest." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 202 (1995).

The Resolution proposes to grant the Tribe and its chosen partner a monopoly to own and operate the Casino; no other person in the State would receive this benefit. As demonstrated

below, this preferential treatment is subject to strict scrutiny as a racial classification. Unlike the federal government, states do not have a special relationship with federally-recognized tribes. Thus, although federal statutes that provide preferences to such tribes generally constitute political preferences that are subject to rational basis review, state statutes that provide such preferences are not entitled to the same deference. As demonstrated below, because the West Warwick Resolution does not concern tribal land and is not in connection with federal legislation that addresses federally-recognized tribes' use of their tribal lands, it constitutes a racial preference that is subject to strict scrutiny.

The federal government has a special relationship with federally-recognized tribes. Because of this special relationship, federal statutes that pertain to a federally-recognized tribe's use of its tribal land are reviewed under the rational basis test. In *Morton v. Mancari*, 417 U.S. 535 (1974), the United States Supreme Court held that a federal statute providing employment preference for members of federally-recognized tribes for jobs at the Bureau of Indian Affairs was subject to the rational basis test and did not violate due process. In so holding, the Supreme Court stated as follows:

> Resolution of the instant issue turns on the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a "guardian-ward" status, to legislate on behalf of federally recognized Indian tribes.

*Id.* at 551. This unique status draws explicitly from the United States Constitution. *Id.* at 551-52. Article I, Section 8, clause 3 provides Congress the power to "regulate Commerce . . . with the Indian Tribes." This grant of power "singles Indians out as a proper subject for separate legislation." *Mancari*, 417 U.S. at 552. Indeed, there is a "solemn commitment of the government toward the Indians." *Id.*

Because this special status applies to federally-recognized tribes, not individual Native

Americans, this status constitutes a political preference, not a racial one. *Id.* at 553-54 & n.24. "The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities . . . ." *Id.* at 554. The Supreme Court has expanded on this principle:

> [F]ederal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as "a separate people" with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a "'racial' group consisting of 'Indians' . . . ."

*United States v. Antelope*, 430 U.S. 641, 646 (1977)(quoting *Mancari*, 417 U.S. at 553 n. 24); *see also Fisher v. District Court*, 424 U.S. 382, 390-91 (1976)(rejecting equal protection challenge to exclusive jurisdiction of Tribal Court over adoptions on bases that such jurisdiction derived from "quasi-sovereign status" of the tribe, not race, and it furthered congressional policy of Indian self-government).

The purpose of according special status to federally-recognized tribes is to promote self-government, both politically and economically, and to further the federal government's trust obligation to such tribes. *Mancari*, 417 U.S. at 541-42; *see White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-144 (1980). Thus, "[i]t is settled that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 500-01 (1979) (quoting *Mancari*, 417 U.S. at 551); *see also Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 733 (9th Cir. 2003). "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed."

*Mancari*, 417 U.S. at 555.

However, "States do not enjoy this same unique relationship with Indians." *Confederated Bands*, 439 U.S. at 501; *see also Artichoke Joe's*, 353 F.3d at 733. The federal government has a trust relationship with federally-recognized tribes; states do not. *See Confederated Bands*, 439 U.S. at 501. Thus, state legislation affecting federally-recognized tribes is not entitled to the same deference as federal legislation.

In *Confederated Bands*, the Supreme Court addressed an equal protection challenge to a state statute that extended the state's civil and criminal jurisdiction to tribal lands of federally-recognized tribes. The Court held that the rational basis standard would apply to the state legislation because it was enacted pursuant to a federal statute:

> States do not enjoy this same unique relationship with Indians, but Chapter 36 is not simply another state law. It was enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians.

*Id.* at 501. Because the state statute applied to tribal lands and was in furtherance of federal legislation, the Court applied the rational basis test. *Id.* at 50 1-02.

> Thus, when a state law applies in Indian country as a result of the state's participation in a federal scheme. that state law is reviewed as if it were federal law. If rationally related to both Congress' trust obligations to the Indians and legitimate state interests, the state law must be upheld.

*Artichoke Joe's*, 353 F.3d at 734 (construing *Mancari*).

Accordingly, a state statute that accords special treatment to Native Americans would be reviewed under the rational basis test (and thereby treated like a federal statute for equal protection purposes) only if the statute (1) applies to a federally-recognized tribe; (2) applies to use of tribal lands; and (3) is pursuant to federal legislation. *Id.* (construing *Mancari*). If these three factors are not satisfied, the state legislation constitutes legislation that favors a particular

racial group (a suspect class), and would be subject to strict scrutiny.

In this case, only the first element is satisfied;[3] the other two are not. The second element is not satisfied because the West Warwick Resolution does not pertain to the Tribe's tribal land. Indeed, the West Warwick Resolution expressly states that the Casino would be located on private property in West Warwick; said Resolution does not set forth any proposed use of tribal land for the Casino. The third element is not satisfied because the West Warwick Resolution is not pursuant to any federal legislation.[4]

Thus, the West Warwick Resolution does not pertain to the use of tribal land and is not pursuant to any federal legislation, so it is not entitled to rational basis review. *See Confederated Bands*, 439 U.S. at 501-02. Indeed, unlike federal statutes that provide Native Americans special treatment,[5] the West Warwick Resolution "in no way relates to native land, tribal or communal

---

[3] The Tribe is a federally-recognized tribe.

[4] The only federal legislation that could be even tangentially related to the West Warwick Resolution is the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq*. However, IGRA applies only if the use of tribal land is at issue. 25 U.S.C. §§ 2710(a)(l), (2), (d)(l); *see Williams v. Babbitt*, 115 F.3d 657, 664 (9th Cir. 1997). That is not the case here. Furthermore, IGRA expressly does not apply to the Tribe's use of its tribal land. 25 U.S.C. § 1708(b).

[5] *See, e.g.*, 7 U.S.C. § 5930 (education programs on Indian land); 12 U.S.C. §§ 4702(11), (16), (20) (community development banks on reservations and tribal lands); 16 U.S.C. § 668a (exception to prohibition on possession of eagle feathers for Indian religious purposes); 16 U.S.C. §§ 1721, 1723, 1729(a)(1) (conservation projects on Indian lands); 20 U.S.C. § 1106b(c)(7) (special consideration to teacher corps participants who teach on Indian reservations and in Alaska Native villages); 25 U.S.C. § 194 (favorable presumption for Indians in title disputes involving Indian land); 25 U.S.C. §§ *1452(c),(d),* 1466, 1495 (loan assistance for purchase of Indian land); 25 U.S.C. § 1644(a) (health care grants for programs "on or near" Indian lands); 25 U.S.C. § 2402(1) prevention of drug traffic in "Indian country"); 25 U.S.C. § 3112 (assistance in management of forests on native land); 25 U.S.C. §§ 3202(9), 3208 (child abuse prevention programs on reservations); 25 U.S.C. §§ 3702, 3703(10) (assistance in management of "Indian agricultural lands"); 26 U.S.C. §§ 38(b)(10), 45A(a) (employment credit for wages paid to workers on native land); 26 U.S.C. § 168(j) (accelerated depreciation schedule for property on Indian reservations); 26 U.S.C. § 4225 (tax exemption for "native Indian handicraft"); 29 U.S.C. §§ 1784, 1784b(1) (reservations and native villages eligible for disaster relief); 42 U.S.C. § 682(i) (skills training within native lands); 42 U.S.C. §§ 1437a(b)(9)-(12) (natives on Indian land eligible for low-income housing); 42 U.S.C. §§ 1471(a), (b)(6) (native villages eligible for financial assistance for farm housing); 42 U.S.C. §§ 3002(6) & (7), 3022(2)(B), 3057, 3058aa (native villages eligible to receive benefits for distribution to elderly natives); 42 U.S.C. §§ 3796gg, 3796gg-2(3) (native village eligible for programs to prevent violence against women); 42 U.S.C. § 4368b(c) (native villages eligible to receive EPA grants); 42 U.S.C. §§ 5302(a)(17), 5306 (native villages eligible for HUD grants); 42 U.S.C. §§ 6702, 6707(a)(l), (h)(2)(B) (public works set asides for native villages).

status, or culture." *Williams v. Babbitt*, 115 F.3d 657, 664 (9th Cir. 1997). Even if the principles set forth in the Supreme Court's decision in *Mancari* are "not necessarily limited to statutes that give special treatment to Indians on Indian land, . . . [that decision] shield[s] only those statutes that affect uniquely Indian interests." *Williams*, 115 F.3d at 665. The West Warwick Resolution is not such a statute; gambling is not a "uniquely Indian interest." Thus, the West Warwick Resolution cannot be treated as if it were federal legislation and is not entitled to rational basis review. Because the West Warwick Resolution accords preferential treatment to a specific ethnic/racial group (certain Native Americans), it is subject to strict scrutiny. *Adarand*, 515 U.S. at 202 (racial preference must be necessary and narrowly tailored to achieve compelling governmental interest).

(ii). The strict scrutiny standard is not satisfied.

For state legislation to survive an equal protection challenge under the strict scrutiny standard, the State must have a compelling governmental interest for the preferential treatment, and the preferential treatment must be necessary and narrowly tailored to achieve that compelling interest. *Adarand*, 515 U.S. at 202. Moreover, because the strict scrutiny analysis applies, the burden is on the State to produce evidence to justify a racial preference. *Cotter v. City of Boston*, 323 F.3d 160, 168 (1st Cir. 2003)(citing *Adarand, supra*, 515 U.S. at 224). The West Warwick Resolution does not satisfy this standard.

There is no compelling governmental interest at issue in this case. Providing assistance to the Tribe may be a compelling *federal* governmental interest, due to the federal government's special relationship with, and trust obligation toward, federally-recognized tribes. However, that is not a compelling *State* interest, given that "States do not enjoy this same unique relationship with Indians." *Confederated Bands*, 439 U.S. at 501.

The West Warwick Resolution does not purport to recite any justification for the special preference given to the Tribe. As such, it fails on its face to survive a strict scrutiny analysis. Furthermore, even if this Court were to analogize to the 2004 Casino Act, which like the West Warwick Resolution, established a West Warwick casino for the Tribe and Harrah's, and which recited several alleged "compelling interests" in support of the proposed legislation, the Court would still be unable to divine any narrowly tailored, compelling interests to justify a monopoly in favor of the Tribe. *See* R.I Gen. Laws §§ 41-9.2-2(3), (4), (6).[6] None of those asserted interests survives scrutiny.

One alleged "compelling interest" in the 2004 Casino Act was the "extended history of relations between the state and the Narragansett Tribe." *See* R.I Gen. Laws §§ 41-9.2-2(4), (6). However, because the State does not have the same unique relationship with federally-recognized tribes that the federal government has, the "extended history of relations" between the State and the Tribe by definition could not constitute a compelling State interest.

Another alleged "compelling interest" in the 2004 Casino Act was the Legislature's desire to help the Tribe achieve "economic self-sufficiency." *See* R.I Gen. Laws §§ 41-9.2-2(4), (6). However, promotion of the Tribe's economic and political "self-sufficiency" is an interest of the federal government, due to its trust obligation to federally-recognized tribes. *Mancari*, 417 U.S. at 541-42. Because the State does not have this same unique relationship with the Tribe, helping the Tribe achieve ''economic self-sufficiency'' is not a compelling interest of the State.

A third alleged "compelling interest" in the 2004 Casino Act was the Legislature's assertion that "the Narragansett Indian Tribe is the only federally recognized tribe involuntarily denied rights under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq*." *See* R.I Gen.

---

6 Significantly, the 2004 Casino Bill described these as "compelling interests," thereby implicitly admitting that strict scrutiny, as opposed to rational basis, is the appropriate standard of review. *See* 2004 Casino Bill, R.I. Gen. Laws § 41-9.2-2(6).

Laws § 41-9.2-2(4). However, this assertion is simply wrong. In the 1970s, the Tribe entered into a settlement with the State to resolve litigation over the Tribe's land claims. That settlement was memorialized in a Joint Memorandum of Understanding (the "JMOU"). Under the JMOU, certain land was put in trust for the benefit of the Tribe, and the laws of the State of Rhode Island (both civil and criminal, except for local property taxation and regulation of hunting and fishing) were made applicable to the Tribe's settlement lands. *See Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335, 1336-37 (D.C. Cir. 1998). Congress codified the terms of the JMOU in 1978 as the Rhode Island Indian Claims Settlement Act (the "Settlement Act"). *See* 25 U.S.C. §§ 1701-16. The Settlement Act expressly states that the Tribe's lands are "subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708(a). Thus, the Tribe *voluntarily and expressly* agreed to State jurisdiction over the Tribe's land.

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq*. IGRA established the scope of state jurisdiction to regulate gaming on tribal lands. That scope is narrower than the broad scope of State civil jurisdiction to which the Tribe had agreed through the JMOU and the Settlement Act. Thus, the issue arose whether IGRA superseded the Settlement Act, *i.e.*, whether IGRA superseded the Tribe's prior agreement to Rhode Island's jurisdiction over the Tribe's lands. That issue was litigated, and the First Circuit held that IGRA had implicitly repealed the Settlement Act's grant of state jurisdiction with respect to the regulation of gambling. *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994).

In response, Congress amended the Settlement Act to reflect its intent that IGRA not repeal the Settlement Act, *i e.*, that IGRA not alter the Tribe's original agreement that the State would have jurisdiction over the Tribe's lands. *Narragansett Indian Tribe v. National Indian*

*Gaming Commission*, 158 F.3d 1335, 1338 (D.C. Cir 1998). The amendment states as follows: "For purposes of the Indian Gaming Regulatory Act (25 U.S.C. §§ 2701, *et seq.*), settlement lands shall not be treated as Indian lands." 25 U.S.C. § 1708(b). That amendment survived constitutional attack on both equal protection and due process grounds. *See Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335, 1339-42 (D.C. Cir 1998). In its decision, the District of Columbia Circuit noted as follows:

> After all, the JMOU, which the Tribe signed, specifically provides that with the exception of laws governing hunting, fishing, and property taxes, "*all* laws of the State of Rhode Island shall be in full force and effect on the Settlement Lands."

*Id.* at 1341 (emphasis in original) (quoting the JMOU).

Thus, years before Congress enacted IGRA, the Tribe voluntarily agreed to State jurisdiction over its lands, in return for a resolution of the Tribe's land claims. Although the Tribe sought to evade that agreement when the perceived greener pastures of IGRA appeared, the Tribe cannot credibly deny that its own agreement is the reason why IGRA does not apply to the Tribe's lands. Thus, the Legislature's assertion that the Tribe "is the only federally recognized tribe involuntarily denied rights under the Indian Gaming Regulatory Act" is demonstrably wrong, and that assertion cannot constitute a compelling interest for the proposed exclusive contract.[7]

Accordingly, none of the Legislature's formerly proffered "compelling interests" satisfies the strict scrutiny standard, and there is no compelling State interest in support of the West Warwick Resolution. Even if there were, the proposed monopoly in favor of the Tribe would not be necessary or narrowly tailored to achieve any such interest. The purpose of according special status to federally-recognized tribes is to promote self-government, both politically and

---

[7] The Tribe is not the only federally-recognized tribe that is excluded from IGRA. The Catawba Indians, the Passamoquoddy Tribe and Penobscot Nation, and the Wampanoag Tribal Council of Gay Head are also subject to state gaming law. *Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335, 1341 (D.C. Cir 1998).

economically, and to further the federal government's trust obligation to such tribes. *Mancari*, 417 U.S. at 54 1-42. The West Warwick Resolution does not pertain to tribal land and is unrelated to any federal legislation, so one could not credibly assert that it is "necessary" for furthering the Tribe's self-government (either political or economic). Indeed, one cannot credibly assert that the West Warwick Resolution is the *only* way that the State could assist Native Americans. Furthermore, the West Warwick Resolution is not "narrowly tailored" because it would exclude every other person in the State from participating in the casino gaming business.[8] Finally, any assertion that a monopoly is necessary "to ensure that the casino gaming facility will be supported by sufficient investment to enable it to compete effectively with casino-resorts in nearby jurisdictions"[9] is without support. Given that two successful casino resorts exist within very close proximity to one another in Connecticut, there is no basis to conclude that it would be "necessary" to limit the number of casinos in Rhode Island to just one to ensure that Rhode Island casinos could effectively compete in the marketplace.

(iii). <u>The rational basis standard is not satisfied</u>.

As set forth above, the applicable standard is strict scrutiny. However, the West Warwick Resolution does not even satisfy the rational basis test. There is no legitimate State interest for the preferential treatment embodied in the West Warwick Resolution. The State, unlike the federal government, has no unique relationship with federally-recognized tribes. *Confederated Bands*, 439 U.S. at 501. Furthermore, the West Warwick Resolution does not pertain to tribal land.

---

[8] The West Warwick Resolution is also unconstitutionally under-inclusive because it would assist only one of the groups of Native Americans in the State (the Tribe) and completely ignore the interests of all other Native Americans in Rhode Island.

[9] *See* 2004 Casino Bill, R.I. Gen. Laws § 41-9.2-3(3); *see also* House Bill No. H 7935, as originally submitted, Recital No. 5 (one stated reason for differentiating tax structure for proposed casino from that for video lottery facilities is to "ensure that the resort casino to be authorized in West Warwick will be supported by sufficient investment to enable it to compete effectively with resort casinos in nearby jurisdictions").

Thus, for purposes of casino gaming (or any other economic activity), the Tribe is no different from any other person in the State, and the State has no legitimate interest in treating the Tribe differently than it treats everyone else. Thus, neither the alleged "extended history of relations between the state and the Narragansett Tribe" nor the Legislature's desire to help the Tribe achieve "economic self-sufficiency" constitutes a legitimate State interest for the proposed monopoly.[10]

Furthermore, as demonstrated above, the Tribe voluntarily and expressly agreed to State jurisdiction over the Tribe's land. Thus, the Legislature's assertion that the Tribe "is the only federally recognized tribe involuntarily denied rights under the Indian Gaming Regulatory Act" is simply wrong. Such an erroneous proposition cannot constitute a legitimate State interest for the proposed exclusive contract.

The United States Supreme Court has issued cautionary language to state legislatures concerning racial preferences:

> The mere recitation of a benign or compensatory purpose for the use of a racial classification would essentially entitle the States to exercise the full power of Congress under § 5 of the Fourteenth Amendment and insulate any racial classification from judicial scrutiny under § 1. We believe that such a result would be contrary to the intentions of the Framers of the Fourteenth Amendment, who desired to place clear limits on the States' use of race as a criterion for legislative action, and to have the federal courts enforce those limitations.

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 490-91 (1989). It is clear, therefore, that the State does not possess the same remedial powers that Congress enjoys under the Fourteenth Amendment. That is especially true with respect to federally-recognized tribes. Not even Congress has attempted to accord such tribes exclusive rights to casino gaming:

---

[10] Furthermore, the State's grant of a monopoly in favor of the Tribe and its chosen partner would deny other Native Americans equal protection. Given that the State has no unique relationship with federally-recognized tribes, the State has no rational basis for treating the Tribe differently than it treats other Native Americans.

> For example, we seriously doubt that Congress could give Indians a complete monopoly on the casino industry or on Space Shuttle contracts. At oral argument, counsel for the government conceded that granting natives a monopoly on all Space Shuttle contracts would not pass *Mancari's* rational-relation test . . . . The casino example . . . is . . . unrelated to "Congress' unique obligation toward the Indians."

*Williams*, 115 F.3d at *665* (quoting *Mancari*, 417 U.S. at 555). Thus, granting the Tribe and its chosen partner a monopoly for a casino gaming facility goes beyond what even Congress could do to benefit federally-recognized tribes. Given that the State lacks the federal government's unique relationship with such tribes, the State cannot possibly have a legitimate interest in granting the Tribe such a preference.

Likewise, conferring on the Tribe's chosen partner, Harrah's Entertainment, the exclusive right to establish the owner/operator entity, to the exclusion of all other interested entities, including the Plaintiff Ajax, violates the Equal Protection Clause. In this regard, the pre-selection of Harrah's would constitute economic regulation invoking rational means scrutiny. However, as argued above, there exists no credible legitimate State objective that could possibly justify the pre-selection of a single gaming entity such as Harrah's. Certainly, there are other qualified potential casino operators, to whom the proposed West Warwick Resolution forever denies the right to compete for the license. Perhaps more importantly, the proposed West Warwick casino was not even the best deal offered to the State during the 2006 legislative session. Because the State ignored an apparently far more lucrative proposal from the entity formed by Ajax and its partner, Trump Entertainment, the pre-selection of the Tribe/Harrah's entity can only be viewed as an arbitrary political deal, not the result of well-reasoned legislative analysis designed to promote the best interests of the State. As such, the pre-selection of Harrah's cannot withstand constitutional scrutiny.

Finally, as with the constitutionally impermissible proposed monopoly accorded to the Tribe and its chosen partner, the proposed Resolution's pre-selection of West Warwick as the location for the casino denies equal protection. Again, there appears to be no legitimate State objective justifying selection of West Warwick to the exclusion of all other municipalities, including the Plaintiff Town of Johnston. This is especially true, where the General Assembly, in passing the Joint Resolution, ignored evidence that the proposed Johnston casino would be far more lucrative. Accordingly, the pre-selection of West Warwick can only be viewed as an arbitrary political deal that cannot withstand constitutional scrutiny.

*2. Violation of First Amendment*

In addition to the foregoing violations of the Equal Protection Clause of the Fourteenth Amendment, the West Warwick Resolution abridges the fundamental rights of Plaintiffs under the First Amendment to the federal constitution to "participate equally in the political process." *See, e.g., Citizens for Equal Protection, Inc. v. Attorney General of Nebraska*, 368 F. Supp. 2d 980, 994-95 (D. Neb. 2005). In this regard, the oversight of casino gambling, including the fitness and qualifications of the owner/operator and the location of the casino, is a political, legislative, and regulatory function to be established under the exclusive purview of the General Assembly. By abdicating this legislative duty in favor of the pre-selection of the Tribe/Harrah's and West Warwick, the West Warwick Resolution **forever** precludes all other person, entities, and municipalities, without a state constitutional amendment, from participating in any political activity or process to petition or solicit the General Assembly for the right to own/operate a casino in the State of Rhode Island. Because such denial creates a permanent barrier to the Plaintiffs' right to petition or to participate in the political process, it is overly broad, and impermissibly abridges valuable First Amendment Rights.

D. Plaintiffs Will Be Irreparably Harmed Unless The Court Grants the Requested TRO And Injunction.

In the event that the voters of Rhode Island are allowed to vote on the unconstitutional West Warwick Resolution, Ajax will sustain irreparable injury, *inter alia*, (i) because it has expended considerable time, funds, and resources in seeking the opportunity for consideration as a qualified owner/operator of a resort casino in Rhode Island, which opportunity will be precluded for all time by the West Warwick Resolution; (ii) because it has secured an option to purchase real estate for the location of a casino, which option will become worthless; (iii) because the voters' consideration of a proposed unconstitutional amendment will foreclose approval of a properly formulated proposed casino amendment; and (iv) because the voters' consideration of a constitutionally flawed proposed amendment will inevitably and impermissibly taint and negatively influence any future efforts to establish a constitutional casino in Rhode Island. Likewise, the Town will sustain irreparable harm in that it (i) has expended substantial time, funds and resources to negotiate and enter into a casino development agreement; (ii) has adopted a town council resolution requesting the General Assembly to authorize the voters of the Town to vote on whether to approve the establishment of a resort casino in the Town; and (iii) will be precluded for all time by the West Warwick Resolution from being considered as a possible location for a resort casino in Rhode Island. In view of these imminent injuries to the Plaintiffs, this Court should grant the requested restraining order and preliminary injunction.

E. In Contrast, The Granting Of The Requested TRO and Preliminary Injunction Will Not Harm Defendant

In the event that the Court grants the requested restraining order and preliminary injunction, the Secretary of State will not be irreparably harmed. Specifically, Plaintiffs do not seek to interrupt the entire ballot preparation process; they seek only to prevent an

unconstitutional proposed amendment from appearing on the ballot. The Secretary of State may continue and complete the ballot preparation without this specific question. Moreover, because the ballot, upon information, does not go to print prior to August 9, the requested TRO and preliminary injunction would only cause a minor inconvenience to the Defendant.

F. The Public Interest Will Not Be Adversely Affected By The Requested TRO and Preliminary Injunction.

The granting of the requested restraining order and preliminary injunction would be consonant with the public interest. Indeed, the issues raised in the Complaint are of great public and constitutional importance, inasmuch as the West Warwick Resolution requires placing a referendum question on the statewide ballot. If, as argued herein, the referendum question and proposed Resolution are unconstitutional, then members of the public will waste much money, time, effort, and energy to familiarize themselves with the controversial issues that the proposed West Warwick casino has raised. Further, the issues surrounding a statewide vote on a casino are especially important because, as the West Warwick Resolution acknowledges, "it is in fairness to the citizens of this state that the constitutionality and authorization of a resort casino . . . be decided by the vote of the citizens : . . ." Accordingly, the citizens of Rhode Island should not be allowed to vote on a proposed unconstitutional amendment to the State Constitution.

*Conclusion*

Based upon all of the foregoing, this Court should grant Plaintiffs' motion for the issuance of a temporary restraining order and preliminary injunction and should temporarily restrain and enjoin Defendant Matthew Brown, in his capacity as Secretary of State for the State of Rhode Island, from taking any action to cause the question whether to approve an amendment to the Rhode Island Constitution, as proposed in General Assembly Joint Resolution No. H 7935/Sub A, to be placed on any statewide or local ballot for the November 2006 General Election.

Respectfully submitted,

AJAX GAMING VENTURES, LLC and
THE TOWN OF JOHNSTON,

By their Attorneys,

SHECHTMAN HALPERIN SAVAGE, LLP

Preston W. Halperin, R.I. Bar No. 5555
Douglas A. Giron, R.I. Bar No. 2943
1080 Main Street
Pawtucket, RI 02860
(401) 272-1400
(401) 272-1403 (fax)

Dated: July 21, 2006