UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AJAX GAMING VENTURES, LLC and<br>THE TOWN OF JOHNSTON,<br>Plaintiffs | : | |
| v. | : | 06-336-S |
| MATTHEW BROWN, in his capacity as<br>SECRETARY OF STATE for the<br>STATE OF RHODE ISLAND, | : | |

**AMICUS BRIEF SUBMITTED BY ATTORNEY GENERAL FOR THE STATE OF RHODE ISLAND, PATRICK C. LYNCH**

## I. FACTS AND PROCEDURAL HISTORY

The General Assembly of the State of Rhode Island passed a joint resolution "to approve and publish and submit to the electors a proposition of amendment to the Constitution of the State to permit a resort casino in West Warwick, Rhode Island, to be privately owned and operated in association with the Narragansett Indian Tribe." (Joint Resolution, Exhibit A to Joint Stipulation of Facts). The 2006 resolution is the third attempt in as many years to try to introduce casino gambling to the Rhode Island landscape. The previous two tries were unsuccessful based on a provision in the Rhode Island Constitution requiring that all lotteries be "operated by" the State of Rhode Island. *See* In Re: Advisory Opinion to the Governor (Casino I), 856 A.2d 320 (R.I. 2004); In Re: Advisory Opinion to the House of Representatives (Casino II), 885 A.2d 698 (R.I. 2005).

The Attorney General agrees that a constitutional amendment is necessary to allow casino ventures that are not operated by the State of Rhode Island. To that end, the resolution under scrutiny here provides for a constitutional amendment as follows:

> Notwithstanding § 15 and 22 of this Article and provided that a majority of the electors in the Town of West Warwick have voted to approve this amendment, the establishment of a resort casino and games located therein is authorized in the Town of West Warwick. The resort casino shall be privately owned and privately operated by a business entity established pursuant to Rhode Island law by the Narragansett Indian Tribe and its chosen partner, which entity shall be: (i) legally distinct and separate from the Narragansett Indian Tribe, (ii) subject to the laws of the state of Rhode Island, including regulation and taxation, and (iii) required in its organizing documents to expressly waive any sovereign immunity relating to any and all matters of the resort casino, including compliance with and enforcement of the laws of the state of Rhode Island, and the regulation and taxation thereof. The per annum tax rate shall be established by the General Assembly with all of such tax proceeds to be dedicated to property – tax relief, as prescribed by statute.

The underlying legislative purpose forming the basis of this extraordinary constitutional preference as articulated by the General Assembly in the resolution is threefold:

- To provide competition via a resort casino in West Warwick to compete with resort casinos in nearby jurisdictions that is not currently being provided by existing video lottery facilities in the state;
- Providing jobs and other economic benefits; and
- Property tax relief.

Earlier this year the Governor requested an advisory opinion from the Supreme Court of the State of Rhode Island as to the constitutionality of the amendment. That request was declined on procedural grounds. (Order, Exh. C to Agreed Statement of Facts). The Attorney General supported that request, given the significant constitutional questions raised. Before the court in the matter *sub judice* is a request for preliminary injunction filed by Ajax Gaming Ventures, LLC, and the Town of Johnston. The Complaint contains three Counts – two based on denial of Fourteenth Amendment (Equal Protection) rights, and one resting on the First Amendment. The request seeks an injunction against placing the casino referendum on the upcoming November ballot. The

Narragansett Indian Tribe and Harrah's have been granted leave of court to intervene in this matter. The Attorney General submits this brief as amicus.

## II. ARGUMENT

**This Court Can, and Should, Declare the Resolution Unconstitutional and Issue an Injunction Against Placing the Proposed Constitutional Amendment on the November Ballot.**

The Federal Courts are the final arbiter and interpreter of the United States Constitution. The challenge mounted to the resolution and proposed constitutional amendment is purely federal in nature. Therefore, this Court is the proper forum within which to decide those issues. Further, state action is final. The classifications that are the subject of this memorandum have been established in their final form by the General Assembly.

It is beyond debate that Article I, Section 1, of the Rhode Island Constitution "authorizes the people to alter and amend their constitution." In re Advisory Opinion to the Governor (Ethics Commission), 612 A.2d 1, 15 (R.I. 1992). This amendment process is not unlimited, however, and "[t]he right to do so is checked only by the limits imposed by the Federal Constitution." Id. The Rhode Island Supreme Court's observation that a state constitutional amendment can be held unconstitutional as violative of the Federal Constitution is beyond serious dispute. See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 783, 115 S.Ct. 1842, 1845 (1995)("The Arkansas Supreme Court held that the amendment [to the Arkansas State Constitution imposing term limits on Congressional candidates] violates the Federal Constitution. We agree with that holding."); Romer v. Evans, 517 U.S. 620 (1996)(state constitutional amendment violated equal protection clause). See also U.S. Const. Art. VI, cl. 2 (Supremacy Clause). Having established that

a state constitutional amendment must be consistent with the Federal Constitution, two questions merit this Honorable Court's consideration: (1) whether the proposed constitutional amendment violates the Federal Constitution, and if so, (2) what is the appropriate remedy. The second question is examined first.

Although various courts and authorities have differed on whether specified ballot referenda should be enjoined pre-election, "[i]t is [nonetheless] clear that a United States District Court has the power to enjoin, under proper circumstances, the holding of an election." Holmes v. Leadbetter, 294 F.Supp. 991, 993 (E.D. Mich. 1968). See also 42 Am. Jur. 2d, Initiative and Referendum, § 47 ("Injunction may also be proper where the measure if adopted would be unconstitutional or conflict with controlling state law."). For instance, in Otey v. Common Council of the City of Milwaukee, 281 F.Supp. 264, 268 (E.D. Wisc. 1968), a federal district court examined whether a referendum relating to a fair housing resolution, if adopted by the electorate, would contravene the Fourteenth Amendment to the United States Constitution. The district court determined that since the City Clerk and the Election Commission were "prepared to act" by submitting the proposed resolution to the electorate, "[a] controversy undoubtedly exist[ed]." Id. at 274. Accordingly, the district court posed a question that might equally apply to the case at bar: "[w]ould this court unjustifiably interfere with the legislative process, were it to grant an injunction so as to proscribe the holding of a referendum prior to enactment into law of the proposed ordinance?" The district court responded in the negative.

Specifically, the district court noted that "the principle of judicial non-interference is one of prudence, not of power." Id. at 276. The court continued that "even if we assume the presence of judicial interference here we must recognize that the principle of

non-interference yields to an exception 'where the constitutional rights of a citizen and taxpayers are sought to be invaded by an attempt to make an unconstitutional or inapplicable law operative through the means of popular election.'" Id. (Emphasis added). After recognizing that "[i]t is clear that a United States District Court has the power to enjoin the holding of an election," the district court cited two cases from the Fifth Circuit Court of Appeals, acknowledged that both cases concerned unconstitutional procedural irregularities, as opposed to substantive violations, and concluded that the substantive violation presented by the ballot referendum in Otey should nonetheless be enjoined. The district court, referencing the two Fifth Circuit cases concerning procedural irregularities, stated:

> [t]o be sure, the procedural nature of these irregularities arguably might distinguish them from the instant case, in which the constitutional blemish is substantive. Nevertheless, there is authority which supports the issuance of an injunction to restrain the holding of a state election regardless of the procedural-substantive distinction, where authority for calling it is missing, or where the holding of it would result in a waste of public funds. Closely in point of the instant case, we are persuaded by the comment that 'it seems to be the majority view that the submission to the voters of an amendment to a state Constitution may be enjoined when the proposed amendment, if adopted, would clearly and palpably violate a provision of the paramount Federal Constitution; and the submission of a statute to the voters may be enjoined where the statute, if adopted, would clearly contravene provisions of either the Federal or state Constitution.' Id. at 276 (citations omitted). See also Hamer v. Campbell, 358 F.2d 215, 217 (5th Cir. 1966)("we remand to the District Court with instructions to set aside the election it should have initially enjoined"); Holmes, 294 F.Supp. 991 (E.D. Mich. 1968)(enjoining referendum proposal).

Accordingly, since the proposed resolution would have been "patently unconstitutional if enacted into law," and because "considerable evidence [was] presented which convince[d] the court that the holding of the referendum would do great irreparable

injury," the district court held that "the resolution to the electorate must be enjoined." Id. at 279.

Although Otey concerned a referendum, as opposed to a state constitutional amendment, other cases discuss the precise issue presented in this case. See generally id. at 277 ("Nor is it material whether the object of the vote is in the form of a proposed constitutional amendment or, as in the instant case, a proposed ordinance."). In Stumpf v. Lau, 839 P.2d 120 (Nev. 1992), for example, the Nevada Supreme Court issued a writ of mandamus directing the Secretary of State to remove from the ballot a proposal (it was initially unclear whether the proposal was a constitutional amendment, a law, or some other type of referendum) that would have placed term limits on United States Congressmen. According to the Nevada Supreme Court, among the reasons for the issuance of the writ, was because "it appeared that if the initiative were approved by the voters, Nevada would be approving a law or an amendment of the state constitution that was violative of the United States Constitution and clearly beyond the powers of this state to enact." Id. at 122. Having determined that the ballot proposal was unconstitutional, the court focused on what it termed the only remaining question: whether "the people should vote on a moot issue," id. at 123, i.e., allow the voters to "'express themselves' in what would amount to a straw poll or statement of public opinion." Id. at 122. The Nevada Supreme Court firmly responded in the negative and, in response to the dissent's suggestion that the court's holding would lead to disenfranchisement, stated that:

> [n]o citizen has a right to participate in a 'straw poll' on an amendment to the State Constitution that clearly violates the United States Constitution. When a proposal is obviously unconstitutional, permitting a vote on the matter will lead only to the creation of false hope and, if passed, eventual anger and disillusionment when the measure is declared unconstitutional.

> It is far better to 'bite the bullet' now, strike the measure from the ballot, and avoid the expense and any false expectations for the proposal.

Id. at 123 n.3.

In another recent case, In re Initiative Petition No. 360, 879 P.2d 810 (Okla. 1994), the Oklahoma Supreme Court reviewed a ballot initiative that would have amended its state's constitution to limit the terms of its Congressman. Although the court determined that "in the circumstances of this case" the specified constitutional challenge was not appropriate for "determination at this pre-election stage," id. at 814, the Oklahoma Supreme Court did embrace the principles articulated in Otey. Specifically, the court recognized that it "may reach a facial constitutional attack in a pre-election setting, when raised, if in this Court's opinion to do so could prevent a costly and unnecessary election." Id. at 814. (Emphasis added). Later, the court observed that it had also previously allowed "pre-election review to clear or manifest facial constitutional infirmities and [] noted [it] will not reach challenges to the interpretation, implementation or application of an initiative proposal because such challenges present only abstract questions which will not be reviewed at an pre-election stage." Id. Nevertheless, since the Oklahoma Supreme Court was not convinced that the constitutional infirmity was "clear or manifest," the court declined to enjoin the referendum question.[1] Id. at 814-15.

[1] In declining to review the substance of the ballot proposal, the court also noted that since the United States Supreme Court had granted certiorari to resolve a similar issue, this factor provided additional support to its decision not to reach the merits of the challenge prior to the election. Id. at 816.

Other courts, including the Rhode Island Supreme Court, are in accord with the foregoing rationale.[2]

Based upon the foregoing, it is clear that federal and state courts possess "discretionary authority to reach clear and manifest facial constitutional challenges at the pre-election stage if, in [the court's] opinion, to do so will prevent the holding of a costly and unnecessary election." In re Initiative Petition No. 360, 879 P.2d at 814.

In the instant matter, this Honorable Court should exercise its discretionary authority and review the proposed constitutional amendment for constitutional infirmity. The public interest would be better served by this admittedly drastic-but necessary-action. As explained below, the proposed constitutional amendment – constitutionally

[2] See In re Advisory Opinion to the Governor (Casino I), 856 A.2d 320, 327 (R.I. 2004)("By delivering our advisory opinion before the question is submitted to the voters, we give credence to this Court's recognition of prevailing public policy in favor of finality and validity of the voting process in this State."); In re Advisory Opinion to the House of Representative (Casino II), 885 A.2d 698 (R.I. 2005)(casino referendum unconstitutional and struck from ballot); Cobb v. State, 924 P.2d 268 (Mont. 1996)(enjoining referendum to amend constitution); Bergdoll v. Kane, 731 A.2d 1261 (Penn. 1999)(enjoining ballot question to amend constitution based on procedural infirmities); Caine v. Robbins, 131 P.2d 516, 520 (Nev. 1942)("To deny the jurisdiction of courts in a case of this character, where a plain, palpable violation of the constitution is threatened, would be to concede that irreparable injury, obvious and undisputed, was beyond the restraint of the remedial arm of equity."); Gray v. Winthrop, 156 So. 270, 272 (Fla. 1934)("If a proposed amendment to the state Constitution by its terms specifically and necessarily violates a command or limitation of the Federal Constitution, a ministerial duty of an administrative officer, that is a party of the prescribed legal procedure for submitting such proposed amendment to the electorate of the state for adoption or rejection, may be enjoined at the suit of proper parties in order to avoid the expense of submission, when the amendment, if adopted, would palpably violate the paramount law and would inevitably be futile and nugatory and incapable of being made operative under any conditions or circumstances."); Mathew v. Turner, 236 N.W. 412, 417 (Iowa 1931)("We are compelled to hold that, if adopted by the voters, it would be invalid for the reasons stated, and therefore a writ of injunction should have been issued by the trial court enjoining the Governor and Secretary of State from submitting said amendment to the voters at a special election.").

mandating a benefit to one privately owned and operated entity to the exclusion of all others – is clearly and palpably unconstitutional. In this respect, it is noteworthy that in 2004 and 2005, the Justices of the Rhode Island Supreme Court twice determined, pre-election, that a proposed casino referendum was unconstitutional. See In re Advisory Opinion to the House of Representatives (Casino II), supra; In re Advisory Opinion to the Governor (Casino I), supra. Now, for the third consecutive year, the State of Rhode Island is faced with another casino referendum, this time as a proposed constitutional amendment, with a constitutional cloud hovering over the voters.

Although the Justices of the Rhode Island Supreme Court declined to review the instant constitutional challenge just last month, their rationale is important and should not be imputed to this Honorable Court for purposes of comity or federalism. Significantly, on July 10, 2006, Governor Donald L. Carcieri sought the Justices' advice on four (4) questions of mixed state and federal law with respect to the proposed constitutional amendment. Noting that the Justices will "only advise the chief executive in those instances in which the questions propounded have a bearing upon a present constitutional duty awaiting performance by the Governor," see In re Advisory Opinion to the Governor (Casino III), (Exh. C to Joint Stipulation of Facts)(emphasis in original), the Justices concluded that in the present situation the Governor "is not called upon to perform a present constitutional duty." Id. at 3. In fact, the Justices continued that in amending the State Constitution, the Constitution "imposes no duty upon the office of Governor." Id. (Emphasis in original). Since the Governor's constitutional duty would not accrue "unless and until the proposed amendment is 'approved by a majority of the electors,'" the Justices concluded that "neither the executive nor judicial branches of the government

may interfere with the process of proposing a constitutional amendment via an Advisory Opinion." Id.

In contrast to the Governor's July 10, 2006 Request for an Advisory Opinion, the instant matter only concerns questions arising under the Federal Constitution, matters properly within the purview of the federal courts and which the federal courts are the final arbiter. See BIW Deceived v. Local S6, Industrial Union of Marine and Shipbuilding Workers of America, 132 F.3d 824, 831 (1st Cir. 1997)("Federal district courts have original jurisdiction over 'federal question' cases – that is, cases 'arising under the Constitution, laws, or treaties of the United States."). Further, in contrast to the Justices' non-binding Advisory Order, which concluded that the Governor's request was procedurally infirm since no duty would inure to the Governor "unless and until the proposed amendment is 'approved by a majority of the electors,'" there can be little doubt that since other state officials, including the Secretary of State, are "prepared to act" by submitting the referendum to the voters a "controversy undoubtedly exists." Otey, 281 F.Supp. at 274.

In addition to significant issues of federal constitutional law, which will be discussed below, this Honorable Court is also presented with a situation where the failure to enjoin an unconstitutional referendum question will lead to irreparable harm. In fact, the Justices in Casino I have already opined that submitting an unconstitutional casino referendum to the voters might well lead to "chaos." Casino I, 856 A.2d 325.

Specifically, in Casino I, the Justices of the Supreme Court observed that "[b]y delivering our advisory opinion before the question is submitted to the voters, we give credence to this Court's recognition of the prevailing public policy in favor of finality and

validity of the voting process in this state." Id. at 327 (emphasis added)(citing State ex rel. Webb v. Cianci, 591 A.2d 1193, 1200-01 (R.I. 1991)). The Justices further explained that:

> [t]he issues raised in the Governor's request [for an advisory opinion] are of great public and constitutional importance. The Casino Act calls for placing the referendum question on the statewide ballot. The Governor's question asks whether the Casino Act and its requirements that the ballot question be submitted to the voters pass constitutional muster. If, as we believe, the question and legislation are void as unconstitutional, then members of the public will waste much money, time, effort, and energy to familiarize themselves with the controversial issues that the proposed casino has raised. This confusion certainly will be intensified by the fact that the Governor and the Attorney General, two general officers of this state, expressly have taken the position that the Casino Act is constitutionally infirm. * * * Because we believe the question and legislation to be unconstitutional, to delay the issuance of our opinion would only postpone the inevitable. If we were to sit idly by while an unconstitutional question was submitted to the voters, only to later issue a binding decision declaring the Casino Act and the referendum question void, chaos might well ensue.

Id. at 325 (emphases added).

The issues presented by the instant referendum are identical to those considered by the Justices in Casino I, the only difference being that the instant referendum seeks a permanent amendment to Rhode Island's most sacred document. Clearly, the issues presented are of "great public and constitutional importance" and much time, money, effort, and energy will be expended (and already has) over the coming months by proponents and opponents of the proposed constitutional amendment. See id. at 325. Furthermore, if this Honorable Court were to "sit idly by while an unconstitutional question was submitted to the voters, only to later issue a binding decision declaring the [proposed constitutional amendment] and the referendum question void," id., such a scenario will lead "to the creation of false hope and, if passed, eventual anger and

disillusionment when the measure is declared unconstitutional." Stumpf, 839 P.2d at 123 n.3. Moreover, given the constitutional infirmities that has already twice invalidated casino referenda in 2004 and 2005, "[a]n instance is conceivable where a majority of the voters included within the limits of the territory to be affected might be decidedly of the opinion that the enactment was opposed to the Constitution, and for this reason abstain from voting." Tolbert v. Long, 67 S.E. 826, 827 (Georgia 1910). The Georgia Supreme Court continued that in this scenario "the law must be adopted, if at all, by a minority vote." Id. Lastly, addressing these constitutional issues pre-election will give credence to the prevailing Rhode Island policy "in favor of finality and validity of the voting process in this state." Casino I, 856 A.2d at 327.

The Attorney General submits that there is abundant support allowing this Court to consider the issues raised by the Plaintiffs' Complaint, and to grant injunctive relief.

**The Resolution Proposes an Amendment to the State's Constitution that Violates the Equal Protection Clause of the United States Constitution.**

The United States Constitution provides that no state shall "deny to any person within its jurisdiction equal protection of the laws." U.S. Const. amend. 14. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985). It is the belief of the Attorney General that the resolution and proposed amendment impermissibly establish classifications with no nexus to achieving the stated purposes of the legislation.

Through the years, two well-recognized levels of scrutiny have evolved for use in equal protection challenges: strict scrutiny and rational basis. The Attorney General submits that the appropriate level of inquiry in this case is strict scrutiny, because the

amendment confers a benefit on one group whose initial qualification for inclusion is genealogy, and disqualifying all others because they are not members of that particular demographic.

Under modern equal protection standards, it is well-established that classifications based on race or ethnic origin are "suspect."[3] This denomination triggers the highest level of scrutiny imposed by the courts. Loving v. Virginia, 388 U.S. 1 (1967)**.** When a classification separates groups by racial or ethnic background, the proponents of the legislation must demonstrate that the classification is precisely tailored to serve a compelling governmental interest**.**

In this case, in order to have the opportunity to engage in the business operation contemplated by the resolution, one must first be a member of the Narragansett Indian Tribe. Although the General Assembly repeatedly mentions that the business entity so favored is to be private, admission into that exclusive group is premised on membership in the Narragansett Indian Tribe. From there, the Tribe chooses a partner, in this case, Harrah's. Thus, the preferred class under the constitutional amendment and the resolution are members of the Tribe and then, Harrah's. The class of people who are not given the opportunity to engage in casino gambling by constitutional amendment are all others not members of the Tribe and its chosen partner.[4]

[3] "Race" is defined as "…2. A group of people united or classified together on the basis of common history, nationality, or geographic distribution…a genealogical line; a lineage." http://disctionary.reference.com/browse/race.

[4] According to the Tribe's website, membership is verified by tracing a person's genealogy to the 1880-1884 rolls. The Tribe's current population stands at approximately 2400 members. See http://www. narragansett-tribe.org/history.htm.

**The Resolution and Amendment Create an Impermissible Ethnic-Based Preference, Therefore, Strict Scrutiny Should Be Applied in Any Equal Protection Analysis.**

As stated above, the resolution and constitutional amendment by their very terms confer a benefit upon one group whose common denominator is ethnicity[5]. Any such classification must be reviewed under strict scrutiny. That level of scrutiny provides that the legislative classification must be precisely tailored to serve a compelling governmental interest. In this case, the governmental interests as set forth by the General Assembly are threefold: property tax relief, competition, and creation of jobs. All are laudable, however, none is "compelling" for constitutional purposes. Further, there is absolutely no nexus between the ethnic preference and the stated reasons for the constitutionally preferred status. While the federal government enjoys a "unique relationship" with Indians, Montana v. Blackfeet Tribe of Indians, 471 U.S. 759 (1985), the same cannot be said of the states. Artichoke Joe's California Grand Casino v. Norton, 353 F.3d 712 (9th Cir. 2003).

The legislative action here grants to the Narragansett Indian Tribe a constitutional monopoly in the gaming industry. The Ninth Circuit has already indicated its opinion that this is likely unconstitutional:

> [W]e seriously doubt that Congress could give Indians a complete monopoly on the casino industry or on Space Shuttle contracts. At oral argument, counsel for the government conceded that granting natives a monopoly on all Space Shuttle contracts would not pass Mancari's rational-relation test …The casino example…is…unrelated to "Congress' unique obligation toward the Indians."

Williams v. Babbitt, 115 F.3d 657, 665 (9th Cir. 1997)(quoting Morton v. Mancari, 417 U.S. 535, 555 (U.S. 1974)).

---

[5] A suspect class can be identified as one possessing an immutable characteristic determined by birth. Johnson v. Robinson, 415 U.S. 361 (1974).

If Congress gives it "unique obligation" towards the Indians, could not grant a monopoly in the casino industry, it is certainly beyond the power of the states to do so.

The memorandum in support of the plaintiffs' application for a TRO contains a discussion of why the "trust doctrine" has no applicability in this case. That doctrine arises from the federal government's special relationship with Indian tribes, and requires an application of the rational basis test when preferences to federally recognized Indian tribes are examined. As stated above, no such special relationship exists between Indian tribes and the respective states. Federal laws promoting tribal self-government and Native American welfare are not premised on racial distinctiveness; rather, such laws are based upon the political relationship existing between tribal and federal governments. Morton v. Mancari, supra. Thus, "[I]t is settled that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive." Washington v. Confederated Bands & Tribes of Yakoma Indian Nation, 489 U.S. 463 (1979).

The cases that review federal classifications giving Indians favored status emphasize that federal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as "a separate people" with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a " 'racial group consisting of 'Indians' …" Artichoke Joe's, 353 F.3d at 733 (citations omitted). It is because of this special relationship between one sovereign

and another that classifications that might otherwise be unconstitutional are reviewed (and often upheld) under rational basis scrutiny.

The classification at issue here divides individuals along racial and ethnic lines, and is not a political preference. Compare the following provision upheld as constitutional with the case at bar:

> The preference is not directed toward a 'racial' group consisting of 'Indians'; instead, it applies only to members of 'federally recognized' tribes. This operates to exclude many individuals who are racially to be classified as 'Indians'. In this sense, the preference is political rather than racial in nature.

Mancari, 417 U.S. at 553, n. 24.

When the federal government establishes a favored classification to a federally recognized Tribe, it usually is reviewed under rational basis standard. When deciding which standard to apply to favored status granted by a state, the following questions must be asked: 1) whether the statute applies to a federally-recognized tribe; 2) whether the statute applies to the use of tribal lands, and 3) whether the statute was passed pursuant to federal legislation. If any of these questions are answered in the negative the enactment constitutes legislation that favors a particular racial group (a suspect class) and thus subject to a strict scrutiny analysis. Artichoke Joe's, 353 F.3d at 734.

Since the proposed constitutional amendment does not pertain to the use of tribal land and is not pursuant to any federal legislation, it is not entitled to rational basis review. See Confederated Bands, 439 U.S. at 501-02. Indeed, unlike federal statutes that provide Native Americans special treatment the proposed constitutional amendment "in no way relates to native land, tribal or communal status, or culture." Williams v. Babbitt, 115 F.3d at 664. Even if the principles set forth in the Supreme Court's decision in

Mancari are "not necessarily limited to statutes that give special treatment to Indians on Indian land,…[that decision] shield[s] only those statutes that affect uniquely Indian interest." Williams, 115 F.3d at 665. The present legislation is not such a statute; gambling is not a "uniquely Indian interest[]." Id. Thus, the referendum and amendment cannot be treated as if it were federal legislation and is not entitled to rational basis review. Because it accords preferential treatment to a specific ethnic/racial group (certain Native Americans), it is subject to strict scrutiny. Adarand v. Pena, 515 U.S.200, 202 (U.S. 1995)(racial preference must be necessary and narrowly tailored to achieve compelling governmental interest).

There is no doubt that this is a case involving a suspect class. The case of In re Bridget R., 41 Cal.App.4th 1483, 49 Cal.Rptr.2d 507 (Cal.App. 1996)(superceded by statute) reviewed adoption restrictions applicable to Native American children. In that case, the California Court first had to determine whether the adoption restrictions were race-based. The following analysis is helpful in the present dispute:

> The Tribe and the biological parents argue that [the statute] does not create a race-based classification, because application of [the statute] is triggered by the child's ***membership*** in a tribe or eligibility for membership, and depends upon the child's genetic heritage only if the child is merely ***eligible*** for tribal membership, in which case the child must be the biological child of a tribal member. This argument is superficially appealing. However, the Tribe and the parents also argue that, under [the statute], tribal determinations of their own membership should generally be deemed conclusive. If tribal determinations are indeed conclusive for purposes of applying [the statute], and if, as appears to be the case here, a particular tribe recognizes as members all persons who are biologically descended from historic tribal members, then children who are related by blood to such a tribe may be claimed by the tribe, and thus made subject to the provisions of [the statute], solely on the basis of their biological heritage. Only children who are racially Indians face this possibility.

Id.

That Court continued, its holding being equally applicable to this case:

> However, any application of [the statute] which is triggered by an Indian child's genetic heritage, without substantial social, cultural, or political affiliations between the child's family and a tribal community, is an application based solely, or at least predominantly, upon race and is subject to strict scrutiny under the equal protection clause.

The Court then invalidated the statutory preference on equal protection grounds.

The Supreme Court has made it clear that even the best of intentions do not insulate illegitimate classifications from strict scrutiny. In Adarand v. Pena, the Court reviewed federal minority hiring preferences on equal protection grounds. In that case, the low-bidding contractor on a USDOT project sued, after his bid was rejected in favor of a contractor deemed "minority" by established regulations. The Court, in rejecting a challenge to Adarand's standing, recognized that the injury in cases of this sort is that a "discriminatory classification prevents the plaintiff from competing on an equal footing." Id. at 211 (citation omitted). The Court agreed to hear the case, finding that the aggrieved party need not allege that he would have obtained the benefit but for the barrier in order to establish standing. Id.

The Court began by reminding that the Equal Protection Clause in the Fourteenth Amendment is an ***explicit*** guarantee of equal treatment. The Court undertook its analysis by noting that racial and ethnic distinctions ***of any sort*** are inherently suspect and thus call for the most exacting judicial examination. Id. at 218 (citation omitted). The following discussion, though lengthy, merits consideration in this case:

> Despite lingering uncertainty in the details, however, the Courts cases...had established three general propositions with respect to governmental racial classifications. First, skepticism: " ' Any preference based on racial or ethnic criteria must necessarily receive a most searching examination,' "***Wygant***, 476 U.S., at 273, 106 S.Ct. at 1847 (plurality opinion of Powell, J.); ***Fullilove***, 448 U.S. at 491, 100 S.Ct., at 2781

> (opinion of Burger, C.J.); see also id. at 523, 100 S.Ct. at 2798 (Steward, J., dissenting) ("[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect"); ***McLaughlin***, 379 U.S. at 192, 85 S.Ct. at 288 ("[R]acial classifications [are] 'constitutionally suspect'"); ***Hirabayashi***, 320 U.S. at 100, 63 S.Ct. 1385 ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people"). Second, consistency: "[T]he standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification," ***Croson***, 488 U.S. at 494, 109 S.Ct. at 722 (plurality opinion); ***id.***, at 520, 109 S.Ct. at 735 (SCALIA, J., concurring in judgment); see also ***Bakke***, 438 U.S. at 289-290, 98 S.Ct. at 2747-2748 (opinion of Powell, J.), *i.e.* all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized. And third, congruence: "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." ***Buckley v. Valeo***, 424 U.S. at 93, 96 S.Ct. at 670; see also ***Weinberger v. Wiesenfeld***, 420 U.S. at 638, n. 2, 95 S.Ct. at 1228, n.2; ***Bolling v. Sharpe***, 347 U.S. at 500, 74 S.Ct. at 694. Taken together, these three propositions lead to the conclusion that any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.

515 U.S. at 223-224.

The Court remanded the minority hiring preferences for strict scrutiny review, stating that "[M]ore than good motives should be required when government seeks to allocate its resources by way of an explicit racial classification system." Id. at 226 (citation omitted). The case of Kornhass Constr., Inc. v. Okla. Dept. of Cent. Serv., 140 F.Supp.2d 1232 (W.D. Okla. 2001), supports the argument that there is no compelling state interest to support the preference here. That case invalidated the Oklahoma Minority Business Enterprise Act, which included a bidding preference to "American Indians", on equal protection grounds. That Court applied a strict scrutiny standard, and found the preference unconstitutional. See also Tafoya v. City of Albuquerque, 751 F.Supp. 1527 (D.N.M. 1990)(invalidating a preference to "members of the Navajo nation or of a federally recognized Indian tribe or pueblo."); Florida A.G.C. Council v. Florida,

303 F.Supp. 2d 1307 (N.D. Fla. 2004)(involving MBE preferences using a strict scrutiny analysis); Malloy v. Harkness, 895 F.Supp. 1556 (S.D. Florida 1995) (invalidating a provision preferring women and minorities for a position on judicial nominating commission); and Malaved v. North Slope Borough, 70 P.3d 416 (Alaska 2003)(involving a Native American employment ordinance under state constitutions' equal protection provision-nearly identical to federal provision).

Clearly, then, this is an ethnic classification subject to strict scrutiny. It is submitted that none of the three bases for the legislative action are "compelling" in the constitutional sense. Further, the most glaring flaw in the proposed constitutional amendment (applicable to both strict scrutiny and rational basis analyses) is the lack of ***any*** connection between the choice of the Tribe and Harrah's and the laudable (but not compelling) goals of competition, tax relief, and job creation. There is nothing in the body of the referendum or proposed constitutional amendment that adequately explains that choice. There is no conceivable rationale why these entities were chosen to the exclusion of all others.

Nor is the amendment "narrowly tailored". It is too broad, since it extends constitutional protection only to a class of one for no good reason. It excludes every other Rhode Islander from engaging in the casino gaming business. A narrowly tailored amendment would have simply removed from the Constitution the requirement that a lottery be "state operated." That action would have had the desired effect, and no more. That is the very essence of narrow tailoring. This legislation does more. It attempts to be a constitutional amendment and statute all wrapped up in one—it removes the constitutional barrier to private operation of casinos and then chooses a class of one, to

the exclusion of all others, to receive the constitutionally protected right to engage in gaming. Under a strict scrutiny analysis, this is fatal.

If the Court believes that it is necessary to venture outside of the four corners of the legislation to determine whether there are any other, more compelling, purposes that might have been considered by the General Assembly[6], the Attorney General submits that no other conceivable purpose can save it. In prior years, the General Assembly has expressly articulated as a purpose its desire "to afford the Narragansett Indian Tribe economic development opportunities" and to promote the Tribe's "economic self-sufficiency". This was not included in this year's legislation, and the General Assembly is presumed to have abandoned that as a basis. In the event that any party argues that this is an interest supporting the referendum and proposed amendment, or if the Court wishes out of abundance of caution to consider this argument, it will quickly become apparent that this argument lacks any merit whatsoever.

As stated above, the state does not have the same interest with the Tribe that the federal government does. As mentioned in Williams v. Babbitt, supra, it is doubtful that Congress could grant Indians a monopoly in the gaming industry. If Congress cannot do it, the state certainly cannot. In the federal arena, according preferred status to federally-recognized tribes is "to give Indians a greater participation in their own self-government; to further the Government's trust obligation toward the Indian tribes; and to reduce the negative effect of having non-Indians administer matters that affect Indian tribal life." Mancari, 417 U.S. at 541-542. Here, the casino will not be on tribal land, and running a

[6] The Attorney General submits that this would be error—the General Assembly clearly articulated three purposes for the legislation. They are presumed to have meant what they said and said what they meant.

casino is not an inherently sovereign or governmental act. In the absence of that special relationship, or any other special factor, the State sponsored assistance in economic development opportunities for the Tribe to the exclusion of all others violates equal protection. Further, the legislation is not narrowly tailored to assist in providing economic development for the Tribe. Again, it is not limited to activities on Tribal land or activities pertaining to self-government. There is no reason to exclude all others from the ability to engage in casino operations. Thus, there is no reason, compelling or otherwise, to open the door to casino gambling to the Tribe and no one else.

**The Legislation Does Not Survive Rational Basis Scrutiny.**

Even if the Court does not believe that strict scrutiny analysis is warranted, it is submitted that the referendum and amendment do not survive even a rational basis scrutiny. The United States Supreme Court has described the rational basis test as follows:

> [T]he Equal Protection Clause is satisfied as long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

Fitzgerald vs. Racing Association of Central Iowa, 539 U.S. 103 (2003)(citation omitted).

In other words, the standard is "whether the classifications drawn in a statute are reasonable in light of its purpose." McLaughlin vs. Florida, 379 U.S. 184 (1964). The task facing this Court is to determine whether the General Assembly articulated a valid reason to treat the Narragansett Indian Tribe and its chosen partner differently from all those not members of the Narragansett Indian Tribe and not its chosen partner when

granting a constitutional right to engage in casino operations. Finally, the Court must consider whether the relationship between the classification and the stated purpose is so weak that the classification must be viewed as arbitrary. Even in economic regulation, the guarantee of equal protection is violated if desirable legislative goals are achieved by the State through wholly arbitrary classifications or otherwise invidious discrimination.

As stated above, the reasons stated for the preference to the Narragansett Indian Tribe and Harrah's are the possibility of property tax relief, competition with casinos in other jurisdictions, and the creation of jobs. It is plain that <u>any</u> type of casino gambling operation would have the same or similar potential to offer property tax relief, competition, and job creation as one operated by the Narragansett Indian Tribe and Harrah's. There is no relationship between the group chosen for constitutional favoritism and the economic benefits sought to be achieved. Even if this Court believes that one or more of the bases for the law are valid and legitimate state purposes, there is no nexus between the favoritism shown and the State interests sought to be advanced. As the Iowa court stated in <u>Racing Association of Central Iowa v. Fitzgerald</u>, 675 N.W.2d 1 (Iowa 2004), "nonetheless, '[o]ur obligation not to interfere with the legislature's right to pass laws is no higher than our obligation to protect the citizens from discriminatory class legislation violative to the constitutional guarantee of equality of all before the law.'" <u>Id</u>. (Citation omitted.)

In <u>Fitzgerald</u>, the Supreme Court of Iowa, upon remand from the United States Supreme Court, wrestled with a similar question. That state's legislature had imposed different tax bases on gambling venues, based on their geographic location, i.e.,

racetracks or riverboats. (The analysis was under the State constitution). The Court found no rational basis to distinguish between the tax rates imposed, saying:

> [I]t appears that both types of gambling enterprises have the potential to enhance the economic climate of the communities in which they are located. If we presume the legislature thought the promotion of gambling was in the economic interests of the general public, then we find no rational basis for distinguishing between gambling that takes place on a floating casino and gambling that occurs at a land-based casino. Regardless of the relative number of such establishments or the size of the city in which they are to be found, excursion boats and racetracks contribute in the same manner to the economy of the local area: they are both gambling enterprises generating gambling receipts that are indistinguishable in terms of the economic benefits to the local community. Id. ***See Arneson v. State,*** 262 Mont. 269, 864 P.2d 1245, 1248-49 (Mont. 1993) (holding statute violated equal protection clause of state constitution because the statutory classifications lacked a rational relationship to the asserted purpose of the legislation, noting 'a classification must distinguish one class from another taking into consideration the purpose of the statute.').

675 N.W.2d at 11.

Likewise, in this case, there is no rational basis for preferring gaming conducted by the Narragansett Indian Tribe and Harrah's over all others. Since the classification is arbitrary, it is contrary to equal protection guarantees of the federal constitution. That being the case, the Court should enjoin this question being placed on the November ballot.

There is another consideration at play in this case—the restructuring of government in only one area, and in favor of a class of one to the exclusion of all others. The Court should consider whether there is a rational basis for this unprecedented alteration of our Constitution. In considering cases affecting voting rights and representative government, courts have departed from the deferential standard that normally characterizes judicial review of state legislation. The only common

denominator in all of these cases appears to be a singularly focused concern recognizing the special judicial duty to ensure to all persons regardless of their social, ethnic or genealogical identity equal access to the day-to-day political process. In Vance v. Bradley, 440 U.S. 93 (1979), the Supreme Court clearly indicated that judicial review of state laws normally operates under the assumption that "even improvident decisions will be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." Id. at 97. However, the foundation of that understanding and that deference is the existence of an impartial democratic process. Accordingly, when the state disaffects, discriminates and removes a particular group from the regular process by which voters' preferences are translated into policy choices, courts should no longer rely on the democratic process alone to prevent arbitrary discrimination, since, by definition, such discrimination silences the voices that can be heard in the democratic process. Such discrimination "is unlikely to be soon rectified by legislative means." City of Cleburne v. Cleburne Living Center, 473 U.S. at 440. Accord, Crawford v. Bd. of Educ., 458 U.S. 527, 546 (1982)(Blackman, J., concurring)("distortions of the political process have special implications for attempts to achieve equal protection of the laws").

In Reynolds v. Sims, 377 U.S. 533 (1964), the Court articulated the "right to full and effective participation in the political process of [the] state's legislative bodies." 377 U.S. at 565. Equal voting rights means that individuals should be given the opportunity to elect representatives who will enact and enforce laws that benefit or are favored by those individuals. Even if a given state law does not directly deny the formal right to cast a ballot for officials elected from equipopulous districts, it can still unconstitutionally

burden the ultimate right to equal representation by "degrad[ing]…a group of voters who will influence the political process as a whole." Davis v. Bandemar, 478 U.S. at 132. Likewise, in Board of Estimate of the City of New York v. Morris, 489 U.S. 688, 693 (1989), it was held that each and every citizen has an inalienable right to full and effective participation in the political processes of the legislative bodies of the nation, state, or locality as the case may be.

In Hunter v. Erickson, 393 U.S. 385 (1969), the voters of Akron, Ohio amended the city charter (akin to the State's Constitution) to require that any fair housing ordinance be approved by the electorate in a referendum. It took from the city council the ability to legislate in this area. The Court rejected the argument that the procedure was permissible, since the electorate was still involved in the process:

> Insisting that a State may distribute legislative power as it desires and that the people may retain for themselves the power over certain subject may generally be true, but these principles furnish no justification for a legislative structure which otherwise would violate the Fourteenth Amendment. Nor does the implementation of this change through popular referendum immunize it.

Id. at 392 (citations omitted).

The Court likened the amendment to vote dilution, stating that the voters of Akron could "no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than any other of comparable size." See Reynolds v. Sims, supra; Avery v. Midland County, 390 U.S. 474 (1968). Hunter, 393 U.S. at 393.

The Decision in Hunter is a direct evolution of Reynolds and Avery concerning dilution of the right to vote. Read together, these cases explicitly recognize that in order to have equal access to the political process there must be equality in two respects: an

individual must have a vote equal to the votes of other persons, and the representatives duly elected must not be uniquely incapacitated from responding to a vote. In other words, group based discrimination in election issues undermines the incentives usually operating on public officials to be responsive. The resolution and proposal here like the amendment in Hunter effectively prevents members of the burdened group i.e. non-Narragansett Indians, from enjoying the same access to the give and take of ordinary government that everyone else typically enjoys.

By singling out a category of legislation only to the extent that such legislation protected certain groups, the Akron charter was held to deprive the members of the burdened groups of the equal protection of the laws. Likewise, to require two types of approval, legislative and statewide electorate,[7] dilutes the votes of both members of the General Assembly, and of the electorate. The democratic process will only be able to change the landscape every four years, and then only with a double victory. There is no good reason for this change, and this new system of government cannot withstand any level of scrutiny.

The fact that the right to vote has not been completely removed from the people of the State of Rhode Island does not cure the fatal defects from the proposed scheme requiring two votes on any future gaming expansion: "Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." Kramer v. Union Free School Dist. No. 15, 395 U.S. 621 (1969) (citation omitted).

---

[7] R.I. Const. Art. 14, sec. 1.

The provision at issue in Kramer (a provision limiting the franchise in school district elections to owners or lessees of taxable property) was found not to have any nexus to the stated legislative purpose. They did not "accomplish this purpose with sufficient precision to justify denying appellant the franchise." The Court applied the tried and true test--that the classifications (here, favoring the Tribe and Harrah's to the exclusion of all other Rhode Islanders) must be tailored so that the exclusion of the appellant and members of his class is necessary to achieve the articulated state goal (here, property tax relief, competition, and jobs). The disenfranchisement of non-property owners in Kramer was held lacking in "the exacting standard of precision we require of statutes which selectively distribute the franchise." Id. at 1892.

To date, in the State of Rhode Island, the right to participate in casino gambling operations has been withheld to all private interests. Any group that desired to have that opportunity was required to obtain a constitutional amendment removing the exclusivity of state operation from the constitution. Under the present resolution and amendment, only one specifically identified group consisting of 2400 members would be given the constitutionally protected right to engage in casino operations, except via the amendment process. The proposed referendum and amendment removes from the entire rest of the populous the right to approach duly elected political leaders for the right to engage in casino operations. As the Court held in Hunter, "the State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." 393 U.S. at 393. Twice in Hunter the Court explained that the amendment at issue was constitutionally offensive because it disadvantaged one group by

making it more difficult for its members to participate in the political process. 393 U.S. at 391, 393. In this case the resolution and amendment creates in effect a special process for one genealogically identifiable group: the Narragansett Indian Tribe, and by extension to Harrah's. Everyone else must wait every four years and then must be successful in two elections in order to amend the state's constitution. This is a dramatic and disproportionate disenfranchisement of the majority of the Rhode Island electorate. It is unconstitutional because it does not relate in any way to the three stated purposes listed by the General Assembly.

Recently the Supreme Court affirmed and further explained the fundamental right to participate in the political process. In Romer v. Evans, supra, the Court invalidated a Colorado constitutional amendment on the ground that it removed statutorily mandated protection from discrimination from one group. In the first sentence of the decision, Justice Kennedy quoted the first Justice Harlan, who one hundred years earlier had admonished that the Constitution "neither knows nor tolerates classes among citizens", citing Plessey v. Ferguson, 163 U.S. 537 (1896)(dissenting opinion). The Court explicitly recognized the "fundamental right" to participate in the political process. Id. at 626.

The Court established that even under the more relaxed rational basis standard, the Colorado constitutional provision was constitutionally repugnant: "we insist on knowing the relation between the classification adopted and the object to be attained." The Court continued, reasoning that a law making it more difficult for one group of citizens than for all others to seek aid from the government "is itself a denial of equal

protection of the laws in the most literal sense. 'The guaranty of equal protection of the laws is a pledge of the protection of equal laws.'" Id. at 633-634 (citations omitted).

## III. CONCLUSION

For the foregoing reasons, the Attorney General respectfully submits that the request for a preliminary injunction be granted.

Respectfully submitted,

PATRICK C. LYNCH
ATTORNEY GENERAL

/s/ *Rebecca Tedford Partington*

/s/ *Michael W. Field*

Rebecca Tedford Partington (#3890)
Deputy Chief, Civil Division
rpartington@riag.ri.gov
Michael W. Field (#5809)
Special Assistant Attorney General
mfield@riag.ri.gov
150 South Main Street
Providence, Rhode Island 02903
TEL: (401) 274-4400, Extension 2303
FAX: (401) 222-2995

**CERTIFICATE OF SERVICE**

I, hereby certify that on this 2nd day of August 2006 I have filed the within electronically and caused to be sent a true and accurate copy via electronic mail to the following attorneys of record:

____________________________

Joseph Avanzato, Esquire
Richard R. Berretta, Esquire
James A. Hall, Esquire
Adler Pollock & Sheehan
javanzato@apslaw.com
rberetta@apslaw.com
jhall@apslaw.com

Preston W. Halperin, Esquire
Shechtman Halperin Savage LLP
phalperin@shslawfirm.com

Lauren E. Jones, Esquire
Jones Associates
ljones@appeallaw.com

John F. Killoy, Jr., Esquire
j.killoy@verizon.net