UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AJAX GAMING VENTURES, LLC and THE TOWN OF JOHNSTON, Plaintiffs | : | |
| vs. | : | 06-cv-336-S |
| MATTHEW BROWN, in his capacity as SECRETARY OF STATE for the STATE OF RHODE ISLAND, THE NARRAGANSETT INDIAN TRIBE, and HARRAH'S WEST WARWICK INVESTMENT COMPANY, LLC, Defendants | : | |

# TRIBE AND HARRAH'S OBJECTION TO PLAINTIFFS' MOTION FOR T.R.O. AND PRELIMINARY INJUNCTION

The Narragansett Indian Tribe and Harrah's West Warwick Investment Company, LLC, hereby object to plaintiffs' motion for T.R.O. and for preliminary injunction. The reasons for their objection are fully set forth in the accompanying memorandum of law.

Narragansett Indian Tribe

By its attorney,

**John F. Killoy, Jr. # 3761**
74 Main Street
Wakefield, RI 02879
Tel: (401) 783-6840
Fax: (401) 782-2490
*j.killoy@verizon.net*

Harrah's West Warwick Investment Company, LLC
By its attorneys,

**JONES ASSOCIATES**
72 South Main Street
Providence, RI 02903
Tel: (401) 274-4446
Fax: (401) 274-2805

Lauren E. Jones # 2141
*ljones@appeallaw.com*

**CERTIFICATION**

On 8/2/06 a true copy of the foregoing was served on all counsel of record and others, listed below, by _______________.

[signature]

Preston W. Halperin, Esq.
Douglas A. Giron, Esq.
**Shectman Halperin Savage, LLP**
1080 Main Street
Pawtucket, RI 02860

Joseph Avanzato, Esq.
James A. Hall, Esq.
**Adler Pollock & Sheehan PC**
800 One Citizens Plaza
Providence, RI 02903-1345

Rebecca J. Partington, Esq.
**Office of the Attorney General**
150 South Main Street
Providence, RI 02903

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AJAX GAMING VENTURES, LLC and THE TOWN OF JOHNSTON, Plaintiffs | : | |
| vs. | : | 06-cv-336-S |
| MATTHEW BROWN, in his capacity as SECRETARY OF STATE for the STATE OF RHODE ISLAND, THE NARRAGANSETT INDIAN TRIBE, and HARRAH'S WEST WARWICK INVESTMENT COMPANY, LLC, Defendants | : | |

# THE TRIBE AND HARRAH'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR T.R.O. AND PRELIMINARY INJUNCTION[1]

## INTRODUCTION

Having waged a protracted and (to date) futile war over the casino question in the General Assembly, the anti-amendment plaintiffs brazenly ask this *Federal* Court to do what the *state's* highest court unanimously refused to do and what other courts reflexively decline to do — scuttle the process for submitting a state constitutional amendment to the people for their consideration. The United States Supreme Court has repeatedly cautioned federal courts not to use the mailed fist of a preliminary-injunction command to interfere with even routine state

1. For simplicity's sake, the Narragansett Indian Tribe shall be called "the Tribe," and Harrah's West Warwick Investment Company, LLC, shall be called "Harrah's."

elections.[2] Given that a proposed constitutional amendment is at stake here, the vote plaintiffs seek to block is anything but routine.

Undaunted, the anti-amendment cohorts calumnize the proposed amendment, claiming it violates the First Amendment (because, they allege, it precludes others "from participating in any political activity or process" to petition the legislature for the right to "own/operate" a casino in Rhode Island) and offends the Equal Protection Clause (because, they say, it gives an impermissible racial preference to the Tribe that flunks strict-scrutiny review). But several threshold principles foredoom their case. Faced with a similar challenge, the Rhode Island Supreme Court — the only authoritative voice on Rhode Island law — declared with unmistakable clarity that "neither the executive nor judicial branches of government may interfere with the process of proposing a [state] constitutional amendment."[3] Critically, too, is the fact the proposed amendment is just that . . . a *proposed* amendment, which may or may not pass, and which therefore implicates doctrinal rudiments (*e.g.*, ripeness) that preclude this Court from adjudicating the case now. Additionally, it's an iron-clad rule that municipalities lack standing to assert the type of constitutional challenges pressed here. Given these verities, the Court ought to rebuff the anti-amendment plaintiffs' pleas to rate the proposed amendment's constitutionality before the election.

Above and beyond these insurmountable obstacles, the anti-amendment allies cannot shoulder the heavy burden inherent in any preliminary-injunction quest. To convince the Court to use this extraordinary remedy to squelch a state constitutional-amendment process, they must

---

2. *See, e.g.*, *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (collecting Supreme Court cases).

3. *In re Advisory Opinion to the Governor (Casino III)*, No 06-201-M.P., at 3 (R.I. Sup. Ct. July 13, 2006) [*Casino III*]; Agreed Statement of Facts [ASF], Exh. C.

show (1) that they have a "substantial" likelihood of success on the merits; (2) that they face a "significant" potential for irreparable injury absent the requested relief, (3) "that the issuance of an injunction will not impose more of a burden on the nonmovant than its absence will impose" on them; and (4) "that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest."[4] They cannot clear these hurdles.

The anti-amendment comrades cannot show that they are substantially likely to prevail on the merits. They've premised their First Amendment theory entirely on a single district court opinion, without bothering to mention that that case met its demise on appeal.[5] And their Equal Protection ruminations are equally infirm. Contrary to their suggestion, the proposed amendment doesn't embody a *racial* preference for the *Tribe*. It refers to a *private business entity* formed under state law by the Tribe and its chosen partner that is "legally distinct and separate" from the Tribe — which is constitutionally permissible.

The anti-amendment compatriots also cannot satisfy the remaining three parts of the preliminary-injunction test. Given that they can sue *post*-election if the proposed amendment passes, they cannot show a realistic prospect of suffering substantial irreparable harm if the Court declines to issue the restrainer *pre*-election. And that fact, coupled with the public's right to participate in this constitutional procedure during the regularly scheduled election cycle, means they cannot meet the other criteria for securing a preliminary injunction.

For these and the other reasons registered below, this Court ought to refuse the anti-amendment allies' invitation to stop this state constitutional-amendment process in its tracks.

---

4. *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001).

5. *See Citizens for Equal Protection, Inc. v. Bruning*, 368 F. Supp. 2d 980 (D. Neb. 2005) (discussed in Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 18), *rev'd* 2006 U.S. App. LEXIS 17723 (8th Cir. July 14, 2006).

## BACKGROUND

Article 14, § 1, of the Rhode Island Constitution sketches a two-step process for proposing and approving amendments: legislators may propose amendments "by a roll call vote of a majority of the members elected in each house," and "any amendment thus proposed" must then be presented to the voters "at the next general election as provided in the resolution of approval." Following this command to a "T," legislative backers of a West Warwick resort casino passed a joint resolution calling for a referendum on a constitutional amendment to establish a casino in the town, "to be privately owned and operated" by a Rhode Island limited liability company (in fact, the Narragansett Tribe/Harrah's Casino Project, LLC — an entity "legally distinct and separate" from the Tribe), with tax proceeds earmarked for desperately needed property-tax relief. *See*, *e.g.*, ASF, ¶¶ 7-8; Joint Resolution; ASF, Exh. A.

Not to be outdone, the Town of Johnston teamed up with a joint venture (of which Ajax Gaming Ventures, LLC, was a participant), and convinced certain legislative proponents of a Johnston resort casino to introduce House Bill 8132. *See* ASF, ¶¶ 10-11; Johnston Casino Bill; ASF, Exh. B. Exercising legislative prerogatives, the House tabled the measure further study. *See* ASF, ¶ 11. And the General Assembly hasn't taken any further action on it. *See id.*

Hoping to stop the public from voting on the proposed constitutional amendment, Governor Carcieri asked the Rhode Island Supreme Court to "determine whether the Joint Resolution" offends the state and federal constitutions.[6] After assaying the particulars of Article 14, § 1, the supreme court unanimously rejected the Governor's request. "[N]either the

6. *See* Letter from Donald L. Carcieri, Governor, to the Justices of the Rhode Island Supreme Court (July 10, 2006); Appendix [A.] 2. In the interest of orderliness, the Tribe and Harrah's have numbered the pages in the attached appendix in the lower right corner.

executive nor the judicial branches of government," the supreme court thundered, "may interfere with the process of proposing a constitutional amendment."[7]

Taking forum-shopping to new heights, the anti-amendment allies make an eleventh-hour plea for this *Federal* Court to enjoin a *state* democratic procedure.[8] But their arguments fail. So this Court ought to deny their preliminary-injunction motion.

## ARGUMENT

### I. A confluence of core principles precludes this Court from adjudicating this controversy now.

The idea of enjoining an ordinary election "is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (compiling United States Supreme Court cases). And this is no ordinary election matter. It involves an important expression of the people's most elemental right of self-governance — the right of Rhode Islanders to vote on whether to amend their state constitution. Ultimately, the anti-amendment partners' attempt to impede this democratic process collapses from the start.

***First:*** To give their position a veneer of plausibility, the anti-amendment allies cherry-pick a few non-Rhode Island cases that suggest that state courts may keep a manifestly unconstitutional proposed amendment off a ballot. Evidently, they hope that this Court will ignore (as they did in their initial memo) what the Rhode Island Supreme Court stressed in

---

7. *Casino III*, No 06-201-M.P., at 3; ASF, Exh. C.

8. "Eleventh-hour," because, despite the Joint Resolution's passage on June 1, 2006, the anti-amendment plaintiffs sprung their complaint a paltry *nineteen days* before the Secretary of State is required to certify questions for the next general election, *see* ASF, ¶¶ 14-15 — giving their opponents precious little time to prepare opposition memos to assist the Court in resolving this matter.

rejecting the Governor's request to test the proposed amendment's constitutionality pre-election — that Article 14, § 1, leaves *no* room for the "the executive" or "judicial branches of government" to "interfere."[9] This pronouncement from the final arbiter on questions concerning the state Constitution puts the kibosh on the anti-amendment allies' efforts to enlist the federal judiciary in their cause.

***Second:*** Not only have they offered a deaf ear to the state high court's counsel — they've also turned a blind eye toward the surplus of caselaw that hews to the majority view that pre-election review of a proposed amendment's constitutionality is taboo. As the Attorney General poignantly advocated in an earlier casino go-around (involving a mere statute, not a proposed constitutional revision): a civil suit to "strike" a "referendum from a ballot is one of the deadliest weapons in the arsenal of the measure's political opponents" — and courts rightly refuse to enter that thicket.[10]

That makes eminent sense. A proposed amendment is in its embryonic stage until approved by a majority of the voting public:

> While the amendment is in such formative state and in the course of progression from proposal to the general election and ratification, it is analogous to ordinary legislation by the General Assembly, which is in its formative state or state of progression from the time of the introduction of a bill * * * until it is finally passed by the requisite constitutional majority and has received the signature of the Governor. The judicial power will not be exerted * * * to stay the course of legislation while it is in the process of enactment. This applies both to ordinary legislation and the analogous course of an amendment to the constitution from the time of the introduction of the act proposing the amendment until the electors have acted.

---

9. *Casino III*, No 06-201-M.P., at 3; ASF, Exh. C.

10. *See* Brief of the Attorney General for the State of Rhode Island at 10, *In re: Request for Advisory Opinion from the Governor*, No. 04-210 M.P. [Attorney General Brf.] (quoting JAMES D. GORDON III AND DAVID B. MAGLEBY, PRE-ELECTION JUDICIAL REVIEW OF INITIATIVES AND REFERENDUMS, 64 NOTRE DAME L. REV. 298, 298 (1989) [PRE-ELECTION JUDICIAL REVIEW]); A. 5.

*O'Kelley v. Cox*, 604 S.E.2d 773, 774 (Ga. 2004) (quoting *Gaskins v. Dorsey*, 150 Ga. 638, 639-40 (1920)). The "[p]ower to amend the constitution belongs exclusively to the legislature and electors," and an attempt to enjoin the Secretary of State from presenting the proposed-constitutional amendment to the people for their contemplation equates with an attempt to restrain a messenger from delivering a legislatively passed bill to the governor for his or her consideration, which courts obviously can't do. *See State ex rel. Cranmer v. Thorson*, 68 N.W. 202, 203-04 (S.D. 1896).[11]

***Third:*** The anti-amendment allies' desire to have this Court stop the people from considering a *proposed* constitutional amendment clashes with key canons that control whenever litigants seek to invoke a federal court's jurisdiction. For example, pre-election review of a proposed amendment that may or may not pass defies the United States Constitution, which forbids federal courts from rendering advisory opinions or from answering hypothetical or contingent queries.[12] That the proposed amendment might not pass makes a suit of this ilk "unripe for review."[13] And it breaches a cardinal command that compels courts to withhold decision on constitutional questions until absolutely necessary.[14] Consequently, this Court ought not entertain the anti-amendment partners' pre-election challenge.

---

11. For an excellent exegetic discussion of the tenets undergirding the majority position that court's won't entertain a pre-election challenge of the type pressed here (complete with copious case citations), see Attorney General Brf. at 9-13; A. 4-8, and PRE-ELECTION JUDICIAL REVIEW, 64 NOTRE DAME L. REV. at 304-11.

12. PRE-ELECTION JUDICIAL REVIEW, 64 NOTRE DAME L. REV. at 305 (discussing, *inter alia*, *Alabama State Fed'n of Labor v. McAdory*, 325, U.S. 450, 461, 65 S. Ct. 1384, 1389 (1945)).

13. PRE-ELECTION JUDICIAL REVIEW, 64 NOTRE DAME L. REV. at 310.

14. PRE-ELECTION JUDICIAL REVIEW, 64 NOTRE DAME L. REV. at 305; *see generally Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 538 (1st Cir. 1995).

***Fourth:*** Unfortunately for the Town, there is yet another barrier blocking its path. A long line of cases hold that a municipality has no standing to assert the type of constitutional attacks unleashed here. *See, e.g., Williams*, 289 U.S. at 40, 53 S. Ct. at 432 (declaring that a municipality has "no privileges or immunities under the federal constitution which it may invoke" against actions by the state); *Coleman v. Miller*, 307 U.S. 433, 441, 59 S. Ct. 972, 976 (1939) ("[b]eing but creatures of the State, municipal corporations have no standing to invoke * * * the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator"). Simply put, municipalities do not have personal rights akin to those protected in the Bill of Rights. *See, e.g., Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998); *accord City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973). So the Town has no standing to assail the proposed amendment under the constitutional provisions it cites.

The bottom line is that a confluence of factors — the state supreme court's commanding pronouncement that the judiciary can't impede the state constitutional-amendment process, the law's strong aversion to pre-election review generally, the Constitution's banning federal courts from issuing advisory opinions, and the anti-amendment allies' inability to satisfy ripeness and standing rules — knocks the legs out from under their case from the start.

## II. The anti-amendment allies cannot shoulder the weighty burden of establishing each facet of the four-part preliminary-injunction test.

Putting these problems aside, the anti-amendment plaintiffs contend that the proposed amendment violates the First Amendment (made applicable to the states through the Fourteenth Amendment[15]) and offends the Equal Protection Clause. But they gain nothing, because they

15. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 1501 (1996).

cannot satisfy the rigorous preliminary-injunction regimen (*i.e.*, likelihood of success, irreparable injury, relevant equities, public interest).

**A. The anti-amendment allies cannot show that they have a "substantial" likelihood of success on the merits.**

**1. Their First-Amendment argument is not tenable.**

Reduced to essentials, their First-Amendment theory runs like this: (1) the proposed constitutional amendment gives the Tribe/Harrah's entity a "monopoly to own and operate the sole resort casino" in Rhode Island, "to the exclusion of all others," which (2) erects a barrier that prevents parties "from participating in any activity or process to petition or solicit the General Assembly for the right to own/operate a casino" in the state, and thus (3) "impermissibly abridges valuable First Amendment Rights." *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 2, 18 (discussing *Citizens for Equal Protection, Inc. v. Bruning*, 368 F. Supp. 2d 980 (D. Neb. 2005)). Their theory, however, is factually unfounded and legally erroneous.

For one thing, the proposed constitutional amendment contains not even a whisper of a hint of a suggestion conferring "monopoly" status on the Tribe/Harrah's entity. The measure doesn't say, for example, that the West Warwick casino shall be the only casino in Rhode Island for all time. Rather — and in direct contradiction of the anti-amendment partners' extravagant hyperbole — given the measure's wording, others will remain free to persuade legislators that another casino is in the public's best interest, too. So the anti-amendment comrades' cries of "monopoly" ring hollow.

For another thing, there's a gaping analytical hole in the make up of their First-Amendment construct. They hinge their First-Amendment theory entirely on a district court case

that met its Waterloo on appeal[16] — a detail they failed to divulge in their initial preliminary-injunction memo. Echoing the district court rescript, the anti-amendment allies basically suggest that the First-Amendment right "to petition the Government for redress of grievances" is breached whenever a clique with full access to the political process doesn't prevail.[17] *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 18 (castigating legislators for not seeing things their way). But, as the Eighth Circuit held in reversing the lower court, the "First Amendment guarantees the right to advocate; it does not guarantee political success." *Citizens for Equal Protection*, 2006 U.S. App. LEXIS 17723, at *29. Deprived of any legal support, the anti-amendment plaintiffs' First-Amendment thesis tumbles like a proverbial house of cards.[18]

---

16. *See Citizens for Equal Protection, Inc. v. Bruning*, 2006 U.S. App. LEXIS 17723 (8th Cir. July 14, 2006), *overruling* 368 F. Supp. 2d 980 (D. Neb. 2005).

17. The Nunes affidavit, for example, sounds the familiar refrains of a suitor jilted in the rough-and-tumble world of politics.

18. The lingo used by the anti-amendment allies in conjuring up their discredited First-Amendment theory — that the proposed measure abridges their rights "to 'participate equally in the political process'" — incorporates buzz words associated with "Political Structure Equal Protection" [PSEP]. PSEP provides that the state cannot restructure political processes to impose unique procedural burdens on minority interests. The paradigmatic example of this phenomenon is *Hunter v. Erickson*, 393 U.S. 385, 89 S. Ct. 557 (1969). There, the Supreme Court discussed the constitutionality of a city-charter amendment that prevented the city council from enacting ordinances dealing with racial discrimination in housing without majority approval of city voters. *Hunter*, 393 U.S. at 386-87, 89 S. Ct. 558. (Before the amendment, the council had the authority to pass ordinances regulating the real estate market. *Id.*) Invoking PSEP principles, the Court found in the charter change "an explicitly racial classification treating racial housing matters differently than other racial and housing matters." *Id.* at 389, 89 S. Ct. at 560. Absent a compelling state reason, the Court concluded, the government cannot disadvantage a particular racial group "by making it more difficult to enact legislation * * *." *Id.* at 393, 89 S. Ct. at 561.

The anti-amendment allies haven't tried dragooning PSEP precepts into their service — and for good reason. The proposed constitutional amendment doesn't require casino aspirants to jump through any additional procedural hoops in the governing process (they simply have to follow the same constitutional-amendment route as before). And, obviously, the plaintiffs here aren't members of a racial minority. So PSEP principles hold no sway.

**2. Their Equal-Protection argument is not tenable.**

The equal-protection theory spun by the anti-amendment plaintiffs suffers a similar fate. Insisting that the proposed constitutional amendment constitutes a "racial preference" for the Tribe, they suggest that the Court should review the measure under the strict-scrutiny rubric.[19] *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 6-15. Statutes that confer "special treatment to Native Americans," they contend, are subjected to rationality review "only if the statute (1) applies to a federally recognized tribe; (2) applies to use of tribal lands; and (3) is pursuant to federal legislation." *Id.* at 9. Since "only the first element is satisfied," they continue, strict scrutiny applies and sinks the measure. *Id.* at 10. Their theory, however, cracks under the stress of inspection.

**a. The proposed constitutional amendment does not grant a benefit to the Tribe *qua* Tribe.**

Even at a casual glance, it strains credulity to suggest, as the anti-amendment allies do, that the proposed measure "accords preferential treatment" to a specific "racial" group — *a.k.a.*, "the Tribe." *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 11. The proposed amendment is a model of syntax, admitting of only one sensible reading. With unmistakable clarity, it declares that a Rhode Island "business entity" (in actuality, the Narragansett Tribe/Harrah's Casino Project, LLC) — an entity "legally distinct and separate" from the Tribe

---

19. Under modern equal-protection analysis, if a law disturbs a fundamental right or affects a suspect classification, then strict scrutiny obtains — meaning the law falls unless the government can demonstrate that the classification has been precisely tailored to meet a compelling governmental interest. But courts test economic legislation for mere rationality — meaning the law survives "if there is any reasonably conceivable state of facts" that could rationally sustain the legislative classification. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 2101 (1993); *accord United States v. Sahhar*, 917 F.2d 1197, 1201 (9th Cir. 1990) (stressing that the "rational basis test is, more a less, a judicial rubber stamp").

— shall own and operate the casino.[20] It confers no benefit on the Tribe *qua* Tribe.[21] Ultimately, the measure's pellucid prose is susceptible to no other reading. And no amount of linguistic or legal legerdemain by the anti-amendment partners can overcome the measure's translucent text. So, with their sole reason for strict scrutiny out of the picture, the highly deferential rationality review takes center stage.[22]

Courts imbue laws that regulate economic benefits or burdens with a towering presumption of constitutionality. *See*, *e.g.*, *Beach Communications*, 508 U.S. at 314, 113 S. Ct. at 2102. So parties mounting an equal-protection challenge face a steep uphill struggle, not only because of this imposing presumption, but also because they must disprove every conceivable reason that might preserve the measure. *See id.* at 315, 113 S. Ct. at 2102. Adding to an already indulgent standard, courts must sustain the measure if any rational basis conceivably exists for it, irrespective of whether the conceived reason "actually motivated the legislature." *Id.* at 315, 113 S. Ct. at 2102. And if the law is rational, the legislature has "absolutely no obligation" to pick the version of a "scheme that a court later would find to be the fairest * * *." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fay Railway Co.*, 470 U.S. 451, 477, 105 S. Ct. 1441, 1457 (1985). Only by constant devotion to these

---

20. *See* Joint Resolution, at 2-3 (emphasis added); ASF, Exh. A.

21. To illustrate the difference, compare the 2005 Casino Act (which gave the Tribe and its preferred partner the right to enter into an exclusive contract as service provider, *see In re Advisory Opinion to the House of Representatives (Casino II)*, 885 A.2d 700, 698 (R.I. 2005)) with the proposed constitutional amendment (which covers a "business entity * * * legally distinct and separate" from the Tribe).

22. Parenthetically, a surplus of other state constitutions contain provisions specifically naming private entities. *See*, *e.g.*, CAL. CONST. ART. XIII, § 4(c) (Huntington Library and Art Gallery); CONN. CONST. ART. VIII, § 3 (Yale University); MASS. CONST. PT. 2, CH. V, § 1, ART. 1 (Harvard College); NEW YORK CONST. ART. XIV, § 1 (International Paper Company); N.D. CONST. ART. X, § 3 (Bank of North Dakota).

guiding tenets "is it possible preserve to the legislative branch its rightful independence and its ability to function." *Beach Communications*, 508 U.S. at 315, 113 S. Ct. at 2102 (quotations omitted).

The anti-amendment cohorts can't carry the heavy burden of showing that the presumptively valid measure lacks rational basis. After all, rational Rhode Island legislators could reasonably conclude that a resort casino owned and operated by the Narragansett Tribe/Harrah's Casino Project, LLC, and situated in West Warwick offers a sensible way to compete with the casino colossi in Connecticut. *See* Joint Resolution; ASF, Exh. A. Given the sophistication and size of two mega-casinos on Rhode Island's doorstep, legislators could rationally decide that this entity — which will possess state-of-art technology, critical marketing expertise, and impressive financial strength — can parry the dazzling offerings at Foxwoods and Mohegan Sun, begetting a thriving casino that will benefit all Rhode Islanders (through job creation and tax proceeds, which will provide much-needed property-tax relief). *See id.*

The anti-casino allies retort that the proposed constitutional amendment "forever denies" other qualified casino operators "the right to compete for a license," adding it wasn't rational for legislators to reject the allies' better deal. *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 17. But their claims are factually barren (again, the proposed constitutional amendment doesn't bar others from pursuing the same prescribed constitutional path followed by the Tribe/Harrah's entity). And they are legally bankrupt, too. Confronting complex economic problems, legislators inevitably feel the push and pull of competing forces as they struggle to craft the best possible solutions under the circumstances. And our constitutional structure gives them "great latitude in regulating the economy, provided the decision is not wacky." *See Saukstelis v. City of Chicago*, 932 F.2d 1171, 1173-74 (7th Cir. 1991). Ultimately, the anti-

amendment allies can't show that the proposed constitutional amendment fails this super-lenient standard.[23]

**b. Even if the proposed constitutional amendment grants a benefit to the Tribe *qua* Tribe (and it does not), it isn't race-based — so rationality review still controls.**

Even assuming, for argument's sake, that the proposed constitutional amendment bestows a benefit to the Tribe *qua* Tribe, the mere rationality test would still be *apropos* because preferences given to native peoples are "political rather than racial in nature." *Morton v. Mancari*, 417 U.S. 535, 554 n.24, 94 S. Ct. 2474, 2484 n.24 (1974) (emphasis added) (using rational-basis review in upholding a congressionally-imposed statutory preference for hiring members of federally recognized Indian tribes to fill positions in the Department of Interior's Bureau of Indian Affairs); *accord Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 732 (9th Cir. 2003) [*Artichoke Joe's*]. Wary of rationality review, the anti-amendment cohorts try to shoehorn this matter into the strict-scrutiny rubric by suggesting that "state legislation affecting federally-recognized tribes is not entitled to the same deference as federal legislation." *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 9. "The federal government has a trust relationship with federally-recognized tribes," they contend, but "states do not." *Id.* Distilling their theory into a three-part test, they suggest that "special treatment to Native Americans" only receives rational-basis scrutiny if the law (1) concerns a federally

---

23. Even if the proposed constitutional proviso created a closed class of casino operators (and it doesn't), it wouldn't offend core equal-protection principles. *See, e.g., City of New Orleans v. Dukes*, 427 U.S. 297, 302-06, 96 S. Ct. 2513, 2516-18 (1976). In *Dukes*, the City of New Orleans forbade pushcart vendors from peddling food in the French Quarter — unless they had been doing so continuously for the pervious eight years. Only two vendors satisfied that standard — meaning other vendors were left out in the cold. The measure was protectionist, anti-competitive. But the Supreme Court said the ordinance didn't offend the Equal-Protection Clause.

recognized tribe; (2) involves the use of tribal lands; and (3) is enacted pursuant to federal legislation. Having created this argument from whole cloth, they conclude — *ipse dixit* — that "state legislation" that favors "federally-recognized tribes" must survive strict scrutiny. Their hypothesis, however, cannot withstand examination.

**i. The state has a trust relationship with the Tribe.**

Striving to remove the proposed amendment from *Mancari*'s reach, the anti-amendment patrons posit that states do not have trust relationships with Indian tribes. To bolster their rhetoric, they cite *Washington v. Confederated Bands & Tribes*, 439 U.S. 463, 99 S. Ct. 740 (1979) [*Confederated Bands*]. Quoting *Mancari*, *Confederated Bands* noted "that 'the unique legal status of Indian tribes under federal law' permits the Federal Government to enact legislation singling out tribal Indians." 439 U.S. at 500-01, 99 S. Ct. at 761. "States," the Court added, "do not enjoy this same unique relationship," though state laws passed under the auspices of the federal-trust relationship share this connection and receive rational-basis review.[24] *See id.* Seizing on this quoted language, the anti-amendment compeers contend that state laws involving "federally recognized tribes" fall outside of *Mancari*'s rational-basis edict, triggering strict scrutiny. *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 9. But the *Confederated Bands* quote cannot bear the weight they put on it.

---

24. *Confederated Bands* involved a challenge to a state law that extended the state's jurisdiction "over Indians and Indian territory within the State" for certain purposes. 439 U.S. at 465, 99 S. Ct. at 743. The disputed state statute was "not simply another state law." *Id.* at 501, 99 S. Ct. at 761. Rather, it "was enacted in response" to federal legislation designed to deal with a related Indian matter. *Id.* This connection brought the state within the ambit of the federal-trust doctrine. So the Court — citing *Mancari* — found "untenable" the suggestion that the law drew a "suspect" classification. *Id.* Instead, the Court held that the state law need only "rationally furthe[r] the purpose identified by the State." *Id.* at 500, 99 S. Ct. at 761 (quotations omitted).

Read in context, the Court's "unique relationship" remark refers to the link forged by the federal government's commerce, treaty, and war powers. "[D]rawn both explicitly and implicitly from the Constitution," these powers create "the unique legal status of Indians under federal law." *Mancari*, 417 U.S. at 551-52, 94 S. Ct. at 2483, *cited in Confederated Bands*, 439 U.S. at 500-01, 99 S. Ct. at 761. Obviously, states do not possess these constitutional powers. But they do have "enough" of a relationship with native peoples to prompt rationality review for laws favoring tribes.

***First:*** The federal government's trust obligation arose from the "privations, indignities, and brutalities" suffered by Native Americans since the time of their first contact with European settlers — an obligation to reverse some of the darker chapters of our history as a Nation. *See Northwestern Bands of Shoshone Indians v. United States*, 335, 355, 65 S. Ct. 690, 700 (1945) (Jackson, J., concurring). So it is here. Centuries before European settlers "discovered" Rhode Island, the Narragansetts lived here in peace, raising and educating their children, caring for their sick and elderly, and fishing in what is now the eponymously named bay. All that changed in 1675. Coveting their land, colonists from Massachusetts, Connecticut, and Rhode Island massacred Narragansett men, women, and children at Great Swamp in South Kingston. *See* WILLIAM G. MCLOUGHLIN, RHODE ISLAND: A HISTORY 40-44 (1978) [RHODE ISLAND]. Selling some of the survivors into slavery, *id.* at 44, they confined the rest to reservation lands in southern Rhode Island.

Over the succeeding centuries, the Narragansetts were exposed to the same types of persecutions as most tribes in the country. Colonists, for example, put the Narragansetts "under a form of guardianship." *See* "Final Determination for Federal Acknowledgement of Narragansett Indian Tribe of Rhode Island," 48 Fed. Reg. 6177 (Feb. 10, 1983). And they

passed acts that affected nearly every facet of life. *See, e.g.*, 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 236 (1856) (discussing a 17th-century act forbidding the "purchase" of any "native" lands "without the consent" of the colony).

After joining the Union, the state of Rhode Island continued exercising dominion over the Narragansetts, passing laws affecting the Tribe's government status after creating a "committee on the affairs of the Narraganset [*sic*] tribe of Indians" to "prepare a set of regulations for their future government." 34 RHODE ISLAND ACTS, RESOLVES AND REPORTS 61 (bound 1940) (emphasis added). The General Assembly also established a "commissioner of the Indian Tribe" to "superintend and oversee the affairs of said tribe," and to "enforce all laws heretofore made for the protection and security of said tribe * * *." *See* "An Act in Relation to the Indian Tribe in this State," *in* 36 RHODE ISLAND ACTS, RESOLVES AND REPORTS 96 (bound 1940). And just as Congress attempted to dissolve tribal governments and assimilate native peoples as citizens, *see Seber*, 318 U.S. at 716, 63 S. Ct. at 926, the General Assembly purported to extinguish the *tribal status* of the Narragansetts and purchased most of their land for a pittance.[25] *See* P.L. 1880, ch. 800, *in* 68 RHODE ISLAND ACTS, RESOLVES AND REPORTS 101-06 (bound 1941). "Not being informed of their obligations to pay local and state taxes," many members later "lost what little land they had left at sheriffs' sales * * *." RHODE ISLAND at 221.

Given the historical parallelism between the federal government's and the state's appalling treatment of Native Americans, it blinks reality for the anti-amendment allies to suggest that the

25. This clashed with the Indian Nonintercourse Act. *See* Act of June 30, 1834, ch. 161, § 12, 4 Stat. 730 (prohibiting land conveyances from Indian tribes to non-Indians unless "made by treaty or convention entered into pursuant to the constitution").

federal sovereign can enact measures designed to remedy the depressed economic circumstances of the tribes but that the state can't.

***Second:*** History aside, courts hold that *Mancari*'s special-relationship analysis does apply to states. *See, e.g., Krueth v. Independent School Dist. No. 38*, 496 N.W.2d 829, 836 (Minn. Ct. App. 1993) (discussing, *inter alia, St. Paul Intertribal Housing Bd. v. Reynolds*, 564 F. Supp. 1408 (D. Minn. 1983) (collecting cases) [*Intertribal Housing*]). Reviewing a state statute that granted "American Indian" teachers layoff protection, the *Krueth* court started with first principles: *Mancari*, the court noted, holds that a "special trust relationship exists between American Indians" and the federal sovereign. *Id.* at 836. "That relationship," the court added, "allows preference to be given to American Indians in certain situations." *Id.* Quoting *Intertribal Housing*, the court held that "'[s]tate action for the benefit of Indians can also fall under the trust doctrine and therefore be protected from challenge under the equal protection clause or civil rights statutes.'" *Krueth*, 496 N.W.2d at 836.

*Intertribal Housing* confronted a state statute that provided low-cost urban housing for American Indians. 564 F. Supp. at 1409-10. The court found that the state legislature had clearly expressed its intent to benefit American Indians, that the preference in urban housing for them was rationally related to the state government's "obligation to the Indians," and that act therefore fell "under the trust doctrine" and survived rationality review. *Id.* at 1413.

Following *Intertribal Housing*, the *Krueth* court ruled that the legislature had expressed "a similar clear intent to benefit American Indians * * * with 'American Indian education programs specifically designed to meet'" the American Indian students' "'unique educational or culturally-related needs.'" *Krueth*, 496 N.W.2d at 837 (quoting the statute). Employing rational-basis review, the court concluded that the policy of keeping American Indian educators

in school districts with American Indian students was rationally related to the legislature's aim of improving education for these students and boosting the number of "American Indian teachers through education programs designed to meet the unique educational and culturally related academic needs of American Indians." *Id.*

Given that the Tribe is the only federally recognized tribe involuntarily denied rights under the Indian Gaming Regulatory Act [IGRA], legislators have launched a constitutional-amendment process which — if the people approve — will give the Tribe viable options for economic development through gaming, creating jobs, supplementing dismal tribal budgets, and enhancing governmental services for the benefit of the tribal community.[26] This is "[s]tate

---

26. Making a gotcha-type claim, the anti-amendment advocates contend that the D.C. Circuit Court rejected the notion that the Tribe "is the only federally recognized tribe involuntarily denied rights" under IGRA. *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 12-13. Not true. Sure, the court said "the Narragansetts are not the only tribe excluded from IGRA * * *." *Narragansett Indian Tribe v. National Indian Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998). But key concept is the Tribe's "involuntary" denial of IGRA rights. And this distinction — not mentioned by the anti-amendment collaborators — draws all the sting from their claim.

Here are the facts: in the 1970s, the Tribe settled a suit it had filed against the state and private landowners concerning its claim to certain lands in Charlestown. *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 689 (1st Cir. 1994). Signing a joint memorandum of understanding [JMOU], the Tribe received "effective control over roughly 1800 acres in Charlestown (the settlement lands), half donated by the state and half by private landowners." *Id.* The JMOU also provided that "the laws of the State of Rhode Island shall be in full force and effect" on settlement lands, with the exception of hunting and fishing regulation and local property taxation. "The titleholders agreed to deed the property to a nascent corporation" that "would be formed to hold title for the tribe's benefit." *Id.* Congress then implemented the JMOU by passing the "Rhode Island Indian Claims Settlement Act," 25 U.S.C. §§ 1701 to 1716, which stated that Narragansett settlement lands are "subject to the civil and criminal laws and jurisdiction of the State of Rhode Island," *id.* § 1708(a). And the General Assembly approved the "Narragansett Indian Land Management Corporation Act," R.I. GEN. LAWS §§ 37-18-1 to 37-18-15, creating the corporation that would hold title to the settlement lands.

In 1988, Congress enacted IGRA, permitting Indian reservation gambling. Prompted by a suit brought by the state, the First Circuit held that the Tribe has "concurrent jurisdiction over, and exercise[s] governmental power with respect to," settlement lands, "and, therefore, [is] entitled to invoke" IGRA. *Narragansett Indian Tribe*, 19 F.3d at 689. This holding discredits the anti-amendment plaintiffs' claim that the Tribe's connection with the Settlement Act "is the reason why IGRA does not apply to the Tribe's land." Pls.' Mem. in Supp. of T.R.O. and

(continued...)

action for the benefit" of the Tribe. *Cf. Krueth*, 496 N.W.2d at 836 (quotations omitted). So it comes within "the trust doctrine" and is thus "protected from challenge" on equal-protection grounds.[27] *Id.* (quotations omitted).

**ii. The state shares in the federal government's trust relationship with the Tribe.**

Assuming, *arguendo*, that the state does not have an independent trust relationship with the Tribe, it does partake of a federal relationship — making rationality review proper. *Cf. Confederated Bands*, 439 U.S. at 500-01, 99 S. Ct. at 761. The *Confederated Bands* Court upheld against an equal-protection challenge a state law assuming jurisdiction over Indian tribes within the state. Because the state passed the act "in response to a federal measure" designed to achieve the result reached by the disputed state law, it shared the federal government's

---

26. (...continued)
Prelim. Inj. at 14.

Senator John Chafee attached a rider to the Omnibus Appropriations Act for fiscal year 1997, which amended the Settlement Act to preclude the Tribe from conducting gaming on settlement lands. And he did this "over the strenuous and adamant objections" of the Tribe. *See* Statement of Senator Daniel K. Inouye, Before the Oversight Hearing of the Committee on Resources, U.S. House of Representatives, on the Provision in the 1997 Omnibus Appropriations Act Relating to the Narragansett Tribe of Rhode Island, *available at* http://commdocs.house.gov/committees/resources/hii41432.000/hii414320.htm. At a later hearing, Senator Chafee agreed that the Tribe had the *same right* as "any other individual or entity" to "bring casino gaming" to the state if it "gain[s] the approval of local and state voters through the referendum process mandated by Rhode Island's Constitution * * *." *Id.* (emphasis added). Ultimately, these facts show that the Tribe *involuntarily* lost its IGRA rights.

27. States joined the Union "with their sovereignty intact." *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S. Ct. 2578, 2580 (1991). Implicit in this sovereignty concept is the understanding that states may act on their own in certain areas of federal responsibility absent federal preemption. Congress does possess plenary power over Indian matters. *See, e.g., Mancari*, 417 U.S. at 551-52, 94 S. Ct. at 2483. But states may pass laws to help Indian tribes, too, provided the laws do not conflict with "any treaty or act of Congress." *New York v. Dibble*, 62 U.S. (21 How.) 366, 370 (1858). Viewed in this light, the General Assembly's actions here rationally further a legitimate governmental goal of promoting tribal economic development, self-sufficiency, and self-government.

relationship with the tribes. *Id.* at 501, 99 S. Ct. at 761. Consequently, rational-basis review applied. *Id.*

So too here: the state's 1978 settlement agreement with the Tribe — resolving title claims and giving certain state laws full effect in the settlement lands — created the type of relationship considered in *Confederated Bands*. And Congress blessed this relationship by passing the Settlement Act. *See* 25 U.S.C. §§ 1701 to 1716. Given Congress's imprimatur, the state's connection to the Tribe is linked symbiotically to the federal-trust relationship — engendering rational-basis review, not strict scrutiny. *See Confederated Bands*, 439 U.S. at 500-02, 99 S. Ct. at 761-62; *see generally New York Assoc. of Convenience Stores v. Urbach*, 699 N.E.2d 904, 908 (N.Y. 1998) (discussing *Confederated Bands* and holding that states "may adopt laws and policies to reflect or effectuate Federal laws designed 'to readjust the allocation of jurisdiction over Indians' without opening themselves to the charge that they have engaged in race-based discrimination").

Also, state laws authorizing tribal gaming "may be rationally related to the furtherance of Congress' unique obligations to the tribes." *Artichoke Joe's*, 353 F.3d at 741 (quotations omitted)). In *Artichoke Joe's*, non-Indian card clubs and charities challenged on equal-protection grounds a state law that allowed only Indian tribes to conduct casino-style gaming. *Id.* at 714. Heeding *Mancari*'s holding that courts must classify preferences in favor of Indian tribes as political, not racial, the Ninth Circuit found that the state's "providing exclusive rights to engage" in casino-style gaming jibed with federal laws that gave Indian tribes critical tools to boost the general welfare of their members. *See id.* at 741. So the court ruled that the state's actions vis-à-vis the tribes furthered the federal government's trust responsibilities to the tribes. And, applying rationality review, the court found no equal-protection infractions. *Id.* at 741-42.

Again, assuming for the sake of argument that the proposed constitutional proviso grants a benefit to the Tribe *qua* Tribe (and it doesn't), rational legislators could conclude that the measure might help the Tribe lift its members from their crushing poverty, promoting economic development and infra-structure improvements. Consequently, it fits together tongue-in-groove with *Artichoke Joe's* rationality analysis. *See id.*; *see also United States v. Garrett*, No. 03-4569, 2005 U.S. App. LEXIS 2611, at *13-14 (4th Cir. Feb. 15, 2005) (unpublished) (rejecting an equal-protection challenge to a state law authorizing tribal gaming because (*inter alia*) the statute's "gaming preferences for Indian tribes" is "a rational means of ensuring the economic development" of the tribe, stressing "that this goal constitutes not just a legitimate, but an important government interest").

**c. The anti-amendment allies' tripartite test for applying rational-basis review is legally flawed.**

The anti-amendment partners' conjured up three-factor test for determining when rationality review applies to state measures that grant "special treatment to Native Americans" (which isn't the case here) doesn't jibe with settled caselaw.[28] *Mancari*, for example, repels their "tribal lands" thesis. *Mancari* rejected an equal-protection challenge to a statutory hiring preference for Indians in the Bureau of Indian Affairs. It had nothing to do with "tribal lands." *Artichoke Joe's* and *Garrett* directly contradict their "federal legislation" conjecture. After all, *Artichoke Joe's* rejected a claim by non-Indians that the state's decision to exempt only gaming by Indian tribes from the state's ban on casino gaming violated equal protection. Similarly, *Garrett* rebuffed a claim that state laws permitting tribal gaming offended equal-protection

---

28. Their three factors are federal tribe, tribal land, and federal legislation. *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 9.

principles. Ultimately, decisional law sinks their thesis. So rationality review applies — and is easily satisfied.

To recap: the anti-amendment allies can't satisfy the "*sine qua non*" of the preliminary-injunction inquiry — *viz.*, that they are substantially likely to prevail on the merits. *See New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). Their First-Amendment theory is factually inaccurate (the proposed constitutional proviso doesn't prevent other casino-owner hopefuls from petitioning the legislature) and legally impoverished (given the Eighth Circuit's *reversing* the district court rescript they relied on exclusively to prop up their First-Amendment claim). And their equal-protection argument fares no better. The proposed constitutional amendment involves a private business entity, not the Tribe *qua* Tribe. Even if one were to indulge, for argument's sake, their baseless suggestion that the proposed proviso confers a benefit on the Tribe directly, rationality review would still reign supreme. And they can't carry the weighty burden of showing that the presumptively valid proviso lacks rational basis. So, having failed to show that they will likely succeed on the merits, they can't obtain interim injunctive relief. *See, e.g., id.* (holding that if movants can't make that threshold showing, the remaining parts of the preliminary-injunction test "become idle curiosity"); *accord LeBeau v. Spirito*, 703 F.2d 639, 645 (1st Cir. 1983) (affirming denial of preliminary injunction and ending inquest because the movants weren't likely to win on the merits).

**B. The anti-amendment allies cannot show a realistic prospect that they'll suffer irreparable harm absent a preliminary injunction.**

Focusing on the irreparable-harm prong of the preliminary-injunction test, the anti-amendment allies march out a parade of horribles. They allege, for example, that they've "expended considerable time, funds, and resources" in pursuing a casino opportunity in

Johnston, all of which will come to naught because the proposed constitutional amendment will "precluded" them "for all time" from making their dream a reality. *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 19. Hardly. Again (and at the risk of sounding like a broken record), the proposed proviso doesn't preclude casino hopefuls from attempting to achieve their goal via the constitutionally established process. And their wild imaginings (even if true, which they aren't) may never develop because the proposed constitutional amendment might not pass. Playing devil's advocate, even if the amendment's passing gives life to the harms alleged (it won't), the anti-amendment allies can *try* to enjoin the proviso then. So there's no need for immediate relief.

Grasping at straws, they suggest that they're entitled to a preliminary injunction "because the voters' consideration of a constitutionally flawed proposed amendment will inevitably and impermissibly taint and negatively influence any future efforts to establish a casino in Rhode Island." *Id.* But they've presented no proof to back their fanciful doomsday rhetoric. And a claim of irreparable harm "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Ultimately, since they can't show a meaningful risk of irreparable harm, they aren't entitled to preliminary injunctive relief. *Cf. Matos v. Clinton School Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) (stressing that "[p]reliminary injunctions are strong medicine, and they should not issue merely to calm the imaginings of the movant").

### C. The anti-amendment allies cannot satisfy the remaining parts of the preliminary-injunction test.

Similarly, the anti-amendment partners can't meet the remaining parts of the four-part paradigm — that the balance of equities (focusing on the hardship to the movants if an injunction doesn't issue) tips in their favor and that the Court's action will advance (or, at least, not harm) the public interest. *McGuire*, 260 F.3d at 42. Their imaginative musings about possible harms — bereft of any competent evidence showing reasonable grounds for believing they're imperiled absent a restrainer — will not do under this prong, either. And their suggestion that a preliminary injunction won't adversely affect the public interest is flatly incorrect.

Rhode Islanders, they say, "should not be allowed to vote on a proposed <u>unconstitutional</u> amendment * * *." *See* Pls.' Mem. in Supp. of T.R.O. and Prelim. Inj. at 20 (emphasis added). But the proposed amendment *isn't* unconstitutional. And enjoining the Secretary of State from placing the provision on the ballot will disserve the public interest. It's indisputably true that the "state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coalition for Economic Equality v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351, 98 S. Ct. 359, 363 (Rehnquist, J., in chambers)). Naturally, there's a strong public interest in letting the people exercise a right vital to the health of our democracy — the right to vote on whether to amend the state constitution. And, "[b]ecause an election reflects a unique moment in time," the people have the right to cast their votes during the regularly scheduled election cycle. *See Southwest Voter Registration Educ. v. Shelley*, 278 F. Supp. 2d 1131, 1145 (C.D. Cal. 2003). For these reasons, courts refuse to delay elections because a contrary approach might influence the outcome: since a vote is "an exercise of public sentiment" reflecting "a unique moment in time," a vote "held after its scheduled date" can't "in any sense be said to be the same." *See*

*id.* So, contrary to the anti-amendment cohorts' contentions, they can't show that the balance of equities and the public interest back their preliminary-injunction quest.

## CONCLUSION

The anti-amendment allies' preliminary-injunction bid sails headlong into a sea of obstacles. Their supplications fly in the face of the Rhode Island Supreme Court's counsel, contravene ripeness and standing requirements, and violate the long-standing rule of judicial restraint that compels courts to withhold decision on constitutional questions until consideration of those questions becomes absolutely necessary. And even if they could navigate around these looming impediments (and they can't), their efforts still founder because they can't satisfy the four-part preliminary-injunction standard. So the Court ought to deny their motion and let the constitutionally prescribed amendment process play out.

Narragansett Indian Tribe

By its attorney,

John F Killoy (mtt)

**John F. Killoy, Jr. # 3761**
74 Main Street
Wakefield, RI 02879
Tel : (401) 783-6840
Fax: (401) 782-2490
*j.killoy@verizon.net*

Harrah's West Warwick Investment Company, LLC
By its attorneys,

**JONES ASSOCIATES**
72 South Main Street
Providence, RI 02903
Tel : (401) 274-4446
Fax: (401) 274-2805

Lauren E. Jones (mtt)

Lauren E. Jones # 2141
*ljones@appeallaw.com*

## CERTIFICATION

On 8/2/06 a true copy of the foregoing (with attached appendix) was served on all counsel of record and others, listed below, by mail.

Susan M Costa

Preston W. Halperin, Esq.
Douglas A. Giron, Esq.
**Shectman Halperin Savage, LLP**
1080 Main Street
Pawtucket, RI 02860

Joseph Avanzato, Esq.
James A. Hall, Esq.
**Adler Pollock & Sheehan PC**
800 One Citizens Plaza
Providence, RI 02903-1345

Rebecca J. Partington, Esq.
**Office of the Attorney General**
150 South Main Street
Providence, RI 02903