# APPENDIX

**Item** **Page**

Letter from Donald L. Carcieri, Governor, to the Justices of the Rhode Island Supreme Court (July 10, 2006) . . . . . . . . . . . . . . . . . . . . 1

Brief of the Attorney General for the State of Rhode Island, *In re: Request for Advisory Opinion from the Governor*, No. 04-210 M.P. (partial) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**State of Rhode Island and Providence Plantations**
State House
Providence, Rhode Island 02903-1196
401-222-2080

06-201

Donald L. Carcieri
Governor

July 10, 2006

*Via Hand Delivery*

To the Honorable Justices of the Supreme Court of the State of Rhode Island:

As you know, in my capacity as Governor of the State I am constitutionally bound to ensure the faithful execution of the laws, including the Rhode Island Constitution. The General Assembly has passed a Joint Resolution, 2006 H-7935, purportedly in accordance with Article XIV of the Constitution, that attempts to amend Article VI, Sections 15 and 22 of the Constitution for a single business entity in several ways (the "Proposed Amendment").

This Court has properly recognized that the people of Rhode Island should know, before they vote on a casino question, whether the provision upon which they are voting (here, an amendment to their Constitution) passes constitutional muster. A right to vote is meaningless if the vote counts for nothing.

Here, as in *Casino I*, "[t]he issues raised in the Governor's request are of great public and constitutional importance." 856 A.2d 320, 325. If the subject constitutional amendment is itself unconstitutional, "then members of the public will waste much money, time, effort, and energy to familiarize themselves with the controversial issues that the proposed casino has raised." *Id.* "The overriding policy favoring pre-election resolution of issues applies equally to controversial and socially important questions concerning a casino operation in this state." *Id.* This Court concluded that "if we were to sit idly by while an unconstitutional question was submitted to the voters, only to later issue a binding decision declaring the Casino Act and the referendum question void, chaos might well ensue." Moreover, even beyond *Casino I* and *Casino II*, 885 A.2d 698 (R.I. 2005), the legal significance of the instant matter is further heightened in that it concerns not whether an actual or potential statute violates the Constitution, but whether a Proposed Amendment to the Constitution that purports to invalidate two prior amendments is *itself* unconstitutional.

I have been made aware that if a constitutional challenge did not proceed in this Court, others would be forced to challenge the Proposed Amendment in Superior Court – a process that

would cause unnecessary and chaotic delay. It is this Court that is the final arbiter of the Constitution and must ultimately determine whether the Joint Resolution passed by the General Assembly violates our sacred document. The teaching of the Justices of this Court in *Casino I* applies with full force here – if there is to be an amendment to the Constitution, Rhode Islanders (on all sides of the casino debate) deserve to know *before* they vote if the amendment process and result are constitutionally sound. The Attorney General of the State shares this belief and concurs that the Proposed Amendment raises significant constitutional issues properly presented in this forum.

As such, I respectfully request the Court's Opinion on the following four questions of law:

1. Does the Proposed Amendment's unprecedented insertion into the Rhode Island Constitution of a special privilege to a single business entity to run the State's sole privately-operated casino in one municipality to the exclusion of all other persons, entities and municipalities violate "the fundamental right to participate equally in the political process" identified by the United States Supreme Court in *Romer v. Evans*, 517 U.S. 620, 626 (1996) and its progeny?

2. Does the Proposed Amendment violate the Equal Protection guarantees of the Rhode Island and United States Constitutions, the First Amendment to the United States Constitution and Article I, section 21 of the Rhode Island Constitution, and the Privileges and Immunities clause of the United States Constitution?

3. Article XIV, section 1 of the Rhode Island Constitution provides, *inter alia*, that a proposed constitutional amendment shall be submitted to the voters of the State at a general election and "if then approved by a majority of the electors voting thereon; it shall become part of the Constitution" and Article I, section 1 provides that any change in the Constitution must be "by an explicit and authentic act of the whole people . . ." The proposed Amendment is only effective "provided that a majority of the electors of the Town of West Warwick have voted to approve this amendment . . . ." Does the ability of the Town to veto the proposed Amendment violate Article XIV, section 1 and Article I, section 1?

4. Does the proposed Amendment's retroactive and selective repeal of Article VI, section 15 and section 22 violate the executive power of the Governor and the General Assembly's plenary power over lotteries?

Respectfully submitted,

Donald L. Carcieri
Governor

cc: The Honorable Patrick C. Lynch, Attorney General

**STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**
**RHODE ISLAND SUPREME COURT**

| | | |
|---|---|---|
| **In re: Request for Advisory Opinion from The Governor (Casino)** | : : : | **No. 04-210 M.P.** |

# BRIEF OF THE STATE OF RHODE ISLAND

By its Attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Rebecca Tedford Partington #3890
Assistant Attorney General
Michael W. Field #5809
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
Fax: (401) 222-2995

execute the laws – is accepted, such an argument would require the Justices of this Honorable Court to render its advice any time the Chief Executive questioned the constitutionality of any enacted legislation thrusting this Court into the center of innumerable political maelstroms. Such an interpretation would contravene several well-established doctrines including that the "gratuitous expansion of the obligation of the Judges under [article 10, sec. 3] is to be avoided," In re Opinion to the Governor, 284 A.2d at 296, and that this Court "shall not reach a constitutional issue unless and until it is absolutely necessary to do so." Dahl v. Begin, 660 A.2d 730, 732 (R.I. 1995). In this vein, it is curious that on the same day that the Legislation was vetoed, Governor Carcieri also vetoed the State budget, among other reasons, because "[a]t least one provision of this article clearly violates our state constitution." *See* Letters to Speaker of the House of Representatives and President of the Senate, July 1, 2004. *Addendum pp.49-53*. Despite vetoes of both legislative acts, and notwithstanding the prospect of both vetoes being overridden, only the constitutionality of the Legislation is before this Court and the Governor has not sought the Justices' advice on the alleged constitutional infirmity contained within the budget. Moreover, it is well-established that when the constitutionality of an enacted statute is challenged, it is the Attorney General who has standing to be heard, not the Governor. See R.I. Gen. Laws § 9-30-11 ("if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state shall also be served with a copy of the proceeding and be entitled to be heard").

**2. Pre-election review of the constitutional issue should be avoided.**

Policy and ripeness considerations likewise militate against the Justices of this Honorable Court from rendering an opinion. Although undoubtedly framed as a legal

**4**

question, there can be little question that the Governor's advisory request places this Honorable Court squarely in the middle of one of this year's most controversial political debates between the Executive Branch and the Legislative Branch. The prospect that the Justices of this Honorable Court will be called upon in this case, as well as in future political questions, to add their voices to referendum questions prior to the completion of the political process, including voter approval or disapproval, will unnecessarily and improperly involve this Court in the political process and interfere with the Separation of Powers Doctrine. *See* Polhill v. Buckley, 923 P.2d 119, 122 (Colo. 1996)("courts cannot interfere in the legislative referendum process by reviewing referenda before they have been submitted to the electorate").

As one authority noted "[a] lawsuit to strike an initiative or referendum from a ballot is one of the deadliest weapons in the arsenal of the measure's political opponents." James Gordon, Pre-Election Judicial Review of Initiatives and Referendums, 64 Notre Dame L. Rev. 298 (1989). This authority continues by observing that "[m]ost courts will not entertain a challenge to a measure's substantive validity before the election," id. at 304, although "[c]ourts generally [will] permit pre-election review of challenges based on procedural or subject matter limitations." Id. at 313.

For instance, in Oregon AFL-CIO v. Weldon, 473 P.2d 664 (Or. 1970), the Oregon Supreme Court reviewed a ballot title for a proposed initiative ordinance. The Petitioners argued that the ballot title conflicted with various statutory provisions, and therefore, the initiative measure could not be validly adopted by the voters. Id. at 667. The Oregon Supreme Court, however, declined to pass on the substantive argument, noting that it has "repeatedly held that the courts are without power to determine the

5

validity of a proposed law or ordinance before its enactment." Id. The Court continued that:

> [w]here all the statutory requirements have been complied with, no court or executive officer has any authority to interfere or prevent a vote thereon. In such case the people alone are authorized to determine whether the proposed measure shall be enacted into law, *and if the measure when enacted, is unconstitutional, then only have the courts power to declare it to be unconstitutional.* The courts, therefore, can no more prevent, when all statutory requirements have been complied with, the people from voting upon a proposed initiative measure, than it could prevent the Legislative Assembly, when convened, from voting upon the same measure. Id (emphasis added) (quoting Carson v. Kozer, 270 P. 513, 515 (Or. 1928)).

Accordingly, although the Oregon Supreme Court did order the ballot title revised, it refused to decide the validity of the measure in advance of the election. Other state supreme courts have reached similar conclusions.

In Hamilton v. Vaughan, 179 N.W. 553 (Mich. 1920), Michigan's Secretary of State was advised by the Attorney General that a proposed amendment conflicted with the United States Constitution, and therefore, should not be submitted to the electorate at the November election. Apparently heeding this advice, Michigan's Secretary of State refused to place the measure on the November ballot, whereupon the plaintiff sued for a writ of mandamus. Despite the Michigan Supreme Court's observation that the constitutional issues were argued "at length and with great ability," the Court opined "it is not our duty at this time to determine these questions." Id. at 554. The Court, focusing its attention on ripeness, concluded that:

> [n]o one knows to any certainty whether, if the amendment is submitted to the legal electors, it will receive a sufficient number of votes to carry it. If it does not receive such a number of votes, no one is harmed. * * * If the proposed

6

> amendment should receive a majority of the legal votes cast, there will then be time enough to inquire whether any provision of the federal Constitution has been violated. Until that time comes we must decline to express any opinion as to the unconstitutionality of the proposed amendment. Id. *See also* Anderson v. Byrne, 242 N.W. 687 (N.D. 1932).

In Dahl v. Lange, 661 S.W.2d 7 (Mo. 1983), taxpayers sought a writ of mandamus to compel city officials to place a citizen-initiated amendment on the ballot after the city refused, citing the measure's alleged unconstitutionality. Even though both parties requested that the Missouri Supreme Court "assess the constitutionality of the proposed amendment," the Court declined to address the constitutional argument and directed the city to place the citizen-initiative on the upcoming election ballot. Id. at 8. The Court noted that *"[u]ntil the people have voted on the initiative*, judicial assessment of the constitutional validity of the proposal would be premature and an encroachment on the legislative function." Id. (Emphasis added). Under similar circumstances, the Ohio Supreme Court refused to strike a measure from its November election ballot on the grounds that the amendment, if passed, would be unconstitutional. *See* Cramer v. Brown, 454 N.E.2d 1321 (Ohio 1983). In Cramer, the Ohio Supreme Court concluded that "[i]t is well-settled that this court will not consider, in an action to strike an issue from the ballot, a claim that the proposed amendment would be unconstitutional if approved, such claim being premature." Id. at 1322. *See also* Tilson v. Mofford, 737 P.2d 1367, 1370 (Ariz. 1987)("procedural violations in the elective process itself must be reviewed by the court prior to the actual election, while the legality of the substance of an initiative cannot be reviewed until the initiative is adopted by the electorate and is later at issue in a specific case").

7

The foregoing authorities demonstrate that when courts are called upon to intervene in the initiative or referendum process, "they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course." Missourians to Protect the Initiative Process v. Blunt, 799 S.W.2d 824, 827 (Mo. 1990). Given the years of heated and divided debate on the casino issue, judicial skepticism is even more appropriate in this case. Indeed, the fact that the Governor's advisory request to this Honorable Court followed his veto by more than one week and that the Governor has not sought the advice of the Justices of this Honorable Court concerning the state budget, which was also vetoed on July 1, 2004 because of the Governor's belief that it was unconstitutional militate against this Court involving itself in the democratic process. Indeed, even the Governor's July 9, 2004 advisory request to this Honorable Court suggests that the General Assembly could forego its constitutional override function "in deference to this Court pending its Opinion on the constitutionality of the [L]egislation." *See* Governor's Letter to the Honorable Justices of the Supreme Court, July 9, 2004. *Addendum, pp.58-59.*

Rather than injecting itself on an expedited basis into this democratic process via the issuance of an advisory opinion, the Justices of this Honorable Court should allow the democratic process to play itself out. Indeed, even as late as the date designated for the submission of briefs, no one can determine with any degree of certainty whether: (1) the General Assembly will fail to override the Governor's veto, thus making the issuance of an advisory opinion moot; (2) the General Assembly will override the Governor's veto, thus making the issuance of an advisory opinion not ripe until voter approval; or (3) the General Assembly will pass an amended bill and/or propose an amendment to the Rhode

Island Constitution for consideration by the voters in November 2004. Even assuming that one or more casino-related measures appear on the November 2004 ballot, a negative response by the voters will conclude the democratic process and decide the issue without the necessity of invoking this Court's advisory jurisdiction.

While undoubtedly the Justices of this Court will be asked to issue an advisory opinion because of the public importance of the casino issue, as well as considerations of judicial economy, courts should "not 'sacrifice the democratic process to the interest of judicial economy.'" Union Electric Company v. Kirkpatrick, 678 S.W.2d 402, 406 (Mo. 1984). Resolution of the Governor's advisory request at this juncture would not only interject the Justices of this Honorable Court into the democratic process, but would also contravene the well-established tenets of ripeness and that this Court will not entertain a constitutional challenge unless absolutely necessary.

Notwithstanding the foregoing, the Attorney General recognizes that "[s]ome courts will strike a measure from the ballot if it is 'clearly' unconstitutional or unconstitutional on its face." Gordon, 312. *See also* Dahl, 661 S.W. 2d at 8 ("[u]nless the amendment is unconstitutional on its face, the exercise of the Court's discretion to reach substantive matters would sacrifice the democratic process to the interest of judicial economy."). In the event that the Justices of this Honorable Court do reach the merits of the Governor's request, the Attorney General believes the Legislation, as presently written, is unconstitutional.

**B. If The Court Decides To Issue An Opinion Regarding The Constitutionality Of The Legislation, It Should Be Invalidated.**

**1. "Lotteries" and the Rhode Island Constitution.**

9

## IV. CONCLUSION

For the foregoing reasons, the State respectfully requests that the Court decline the request to issue an advisory opinion on the question posited by the Governor. In the alternative, the State believes that the Legislation should be declared unconstitutional.

Respectfully Submitted,

STATE OF RHODE ISLAND

By its attorneys,

PATRICK C. LYNCH
ATTORNEY GENERAL

Rebecca Tedford Partington #3890
Assistant Attorney General
Michael W. Field #5809
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
Fax: (401) 222-2995