THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| AJAX GAMING VENTURES, LLC and THE TOWN OF JOHNSTON, Plaintiffs | : | |
| v. | : | C.A. No. 06-336 S |
| MATTHEW BROWN, in his capacity as SECRETARY OF STATE for the STATE OF RHODE ISLAND, THE NARRAGANSETT INDIAN TRIBE, and HARRAH'S WEST WARWICK INVESTMENT COMPANY, LLC, Defendants | : | |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF <u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Plaintiffs, Ajax Gaming Ventures, LLC ("Ajax") and the Town of Johnston (the "Town"), hereby submit this supplemental memorandum of law in support of their Motion for Preliminary Injunction.

***Introduction***

The revered Judge Raymond J. Pettine once wrote:

> There is no purer duty of a federal judge than to hear the petitions of the citizenry, in open court, and to safeguard those constitutional principles which ensure dynamic political debate and, above all, a fair political process.

*Devine v. State of Rhode Island*, 827 F. Supp. 852 (D.R.I. 1993). The case before the Court presents an opportunity for the Court to uphold and safeguard the constitutional principles upon which this nation was founded. While the parties will submit to the Court legal arguments on countless points of law, when all is said and done, this Court will decide whether or not the voters of the State of Rhode Island should be presented on election day with a ballot question that

offends the Constitution of the United States by violating both the First and Fourteenth Amendments.

Plaintiffs are cognizant of their burden to convince the Court that this is an "exceptional" case warranting judicial intervention into the state election process. *See Griffin v. Burns*, 570 F.2d 1065, 1078-1079 (1st Cir. 1978). Plaintiffs also recognize that in order for the Court to issue an injunction ordering the Secretary of State not to submit the referendum question to the voters, the Court must be convinced that it is appropriate for the Court to conduct a "pre-election review" of the constitutionality of a proposed amendment to the Rhode Island State Constitution. *See Otey v. Common Council of Milwaukee*, 281 F. Supp. 264, 276-280 (E.D. Wis. 1968). Finally, plaintiffs acknowledge that for the Court to enjoin the ballot question, plaintiffs must satisfy the standards for injunctive relief, including irreparable harm to plaintiffs should the injunction not be issued. *LeBeau v. Spirito*, 703 F.2d 639, 642 (1st Cir. 1983).

For the reasons set forth below, plaintiffs submit that they have met their burden and request that the Court issue a preliminary injunction that not only protects and preserves plaintiffs' constitutional rights, but also furthers the public interest in a fair and open process that comports with fundamental constitutional precepts.

## ***Argument***

### I. **This case warrants federal court intervention in the state election process.**

In *Griffin v. Burns, supra*, the Court noted that with respect to "garden variety election irregularities," circuit courts of appeals have uniformly declined to endorse pre-election action under 28 U.S.C., §1983. However, finding that the facts in *Griffin* amounted to the "exceptional" case, the First Circuit affirmed the district court's decision invalidating a primary election that

used absentee and shut-in ballots contrary to state law. The Court held that when due process is implicated, "a federal judge need not be timid, but may and should do what common sense and justice require." *Id.* at 1078.

Following *Griffin*, the First Circuit has adhered to a policy of federal court intervention in a state election process where a constitutional infirmity exists. In *Henry v. Connolly,* 910 F.2d 1000 (1st Cir. 1990), the Court was asked to order that a referendum question be placed on the ballot, despite the fact that the Massachusetts Supreme Judicial Court had already ruled that by failing to have the initiative petition "subscribed by 10 qualified voters" as required by the state constitution, the ballot question could not be presented to the voters. Although the facts in *Henry* did not warrant federal intervention, the First Circuit stated, "it is important to remember that the federal nose cannot be poked into the state's tent unless some constitutional infirmity exists. So long as the constitutional minimum is met, our task ends." *Id.* at 1004.

In *Bonas v. Town of North Smithfield*, 265 F.3d 69 (1st Cir. 2001), the federal court intervened in the local election process of the Town of North Smithfield, by requiring the town to conduct a municipal election. Three years later, in *Rossello-Gonzalez v. Calderon-Serra*, 398 F.3d 16 (1st Cir. 2004), reprinted as amended at 398 F.3d 1, the First Circuit revisited the issue of when the federal court should intervene in a state election process. In *Rossello-Gonzalez,* the Court reversed the district court decision to intervene in state election process on the grounds that under the facts of the case, no voters were disenfranchised. Significantly, the First Circuit left the door open for wider federal court intervention, noting that " . . . [w]e do not foreclose the possibility of a case in which federal intervention would be appropriate without a showing of disenfranchisement." *Id.* at 41. *Griffin* and the line of cases that follow leave no doubt that in the appropriate case, where constitutional infirmities must be addressed, the Court can and will

exercise jurisdiction under 28 U.S.C. §1343(3) to "redress the deprivation, under color of any State law, statute, . . . custom or usage, of any right, privilege or immunity secured by the Constitution of the United States." *Griffin,* 570 F.2d at 1070.

**A. This is an Exceptional Case Warranting Federal Court Intervention.**

There can be no doubt that this is an exceptional case. The Rhode Island Supreme Court has already ruled that the Governor did not have standing to seek an Advisory Opinion as to the constitutionality of the ballot question. *In re Advisory Opinion to the Governor (Casino III),* 2006 Lexis 141 (slip op.) (R.I. July 13, 2006). In addition, amid tremendous media coverage and public interest, prior efforts by the very same Rhode Island legislature to grant a casino monopoly to Harrah's and the Narragansett Indians have been found to be unconstitutional. *See In re Advisory Opinion to the Governor (Casino I),* 856 A.2d 320 (R.I. 2004) and *In re Advisory Opinion to the House of Representatives (Casino II),* 885 A.2d 698 (R.I. 2005).

The extraordinary nature of this case is further illustrated by the fact that the Attorney General of the State of Rhode Island, who is charged with enforcing the laws of the state, has publicly declared the proposed amendment to be unconstitutional. *See, e.g., "Governor, Attorney General ask for casino opinion,"* Providence Journal, July 10, 2006 available at http://www.projo.com/news/casino/content/projo_20060710_casino.4525f328.html. At the same time, the Governor's doubt as to the constitutionality of the amendment caused him to take the extraordinary step of seeking the Advisory Opinion that the state supreme court declined to provide.

Plaintiffs respectfully suggest that this is an exceptional case which implicates both the Equal Protection Clause and the First Amendment to the federal constitution. Accordingly, this Court should follow the direction of the First Circuit in *Griffin* and do what common sense and

justice require – intervene in order to safeguard plaintiffs' First Amendment and Fourteenth Amendment rights.

**B. <u>Pre-Election Review is Appropriate in this Case</u>.**

While the First Circuit has yet to rule on the propriety of a pre-election review of the constitutionality of a state ballot question, there is ample precedent from state and federal courts to support a review of the proposed amendment in this case. First, there can be little doubt that *Griffin* and its progeny stand for the proposition that the federal court may intervene to protect voters from constitutional infirmities in the election process. It logically follows that the Court may intervene to enjoin the submission to the voters of a question that would enact a law or state constitutional amendment that runs afoul of the federal constitution. *Otey, supra,* 281 F. Supp. at 276.

In *Otey*, a Wisconsin federal district court considered the power and propriety of federal court intervention to review, and if appropriate, enjoin the submission of a ballot question to the voters of the City of Milwaukee. In that case, the plaintiffs sought to enjoin the placement on the city ballot of a resolution that would prohibit Milwaukee's City Council from enacting any ordinance that might restrict the right of owners of real estate to sell, lease or rent their private property. The plaintiff claimed that the proposed resolution would deny him and his class – "[African-American] residents of the City of Milwaukee" – equal protection under the Fourteenth Amendment to the United States Constitution. *Id.* at 268. Determining first that the federal court had the power to enjoin a referendum question that it found to be unconstitutional, the Court then found that "the resolution which is presented to us in this case would be patently unconstitutional if enacted into law. No good reason has been shown for its submission to the electorate . . . . Under these circumstances submission of the resolution to the electorate must be

enjoined." *Id* at 279; *see also Ellis v. Mayor and City Council of Baltimore*, 234 F. Supp. 945 (D. Md. 1964) (federal court enjoined referendum that would have reapportioned city council), *aff'd*, 352 F.2d 123 (4th Cir. 1965).

As was the case in *Otey*, other courts that have addressed the issue of whether to intervene in a ballot question have generally acknowledged a principle of judicial non-interference, but have made it clear that the principle is "one of prudence, not of power." "The principle of non-interference yields to an exception where the constitutional rights of a citizen and taxpayer are sought to be invaded by an attempt to make an unconstitutional or inapplicable law operative through the means of popular election." *Otey, supra,* 281 F. Supp. at 276. The court in *Otey* was persuaded by a comment that:

> [it] seems to be the majority view that the submission to the voters of an amendment to a state Constitution may be enjoined when the proposed amendment, if adopted, would clearly and palpably violate a provision of the paramount Federal Constitution; and the submission of a statute to the voters may be enjoined where the statute, if adopted, would clearly contravene provisions of either the Federal or state Constitution.

*Id.* at 276.

State courts that have considered the issue of pre-election review of a ballot question have adhered to the principle of judicial intervention where the proposed law [or amendment to the state constitution] would constitute a "plain and palpable" violation of the federal constitution. *McFadden v. Jordan*, 32 Cal. 2d 330, 196 P.2d 787 (Cal. 1948); *Gray v. Winthrop,* 115 Fla. 721, 727, 156 So. 270, 272 (Fla. 1934); *Cobb v. State of Montana,* 278 Mont. 307, 924 P.2d 268 (Mont. 1996); *Stumpf v. Lau*, 108 Nev. 826, 831, 839 P.2d 120, 123 (Nev. 1992).[1] Countless courts have

[1] These cases are treated in more detail in plaintiff's previously submitted memorandum in support of temporary restraining order and preliminary injunction.

recognized the propriety of enjoining an unconstitutional ballot question from being presented to the voters.[2]

In *In re Initiative Petition No. 349, State Question No. 642,* 1992 Okla. 122, 838 P.2d 1, 8 (Okla. 1992) the Supreme Court of Oklahoma observed that

> [T]his Court . . . has held that a determination on a constitutional question as to the legality of a measure proposed to be enacted into law by the people will be reached by this Court . . . if, in the Court's opinion, reaching the issue may prevent the holding of a costly and unnecessary election . . . . [I]f a properly preserved constitutional challenge is leveled at a proposed law and a ruling on the issue would prevent a useless election resulting in the enactment of an unconstitutional statute, this Court has the authority, as well as the responsibility, to decide the matter.

Courts that have considered pre-election review of ballot questions have expressed a strong public policy rationale. As the California Supreme Court stated in *American Fed'n of Labor v. Eu,* 36 Cal. 3d 687, 696, 686 P.2d 609, 614 (Cal. 1984):

---

[2] This principle of prudence is one that many federal and state courts follow in reviewing proposed initiatives for constitutionality or conflicts with existing statutes or state laws before deciding whether to submit them to voters for approval or enjoin their placement on the ballot. *Whitson v. Anchorage*, 608 P.2d 759 (Alaska 1980)(proposed amendment in clear conflict with state law was removed from the ballot); *Legislature of State of California v. Deukmejian*, 34 Cal. 3d 658, 669 P.2d 17 (Cal. 1983)(proposed initiative to redistrict the state was unconstitutional and therefore enjoined); *West Hartford Taxpayers Ass'n, Inc. v. Streeter*, 190 Conn. 736, 462 A.2d 379 (Conn. 1983)(court refused to compel a vote on a proposed ordinance that was contrary to town charter); *Hessey v. Burden*, 615 A.2d 562 (D.C. 1992)(court reversed lower court's injunction of a proposed unconstitutional initiative but declined to join non pre-review jurisdictions holding that pre-election review should be limited only to extreme cases); *Rivergate Restaurant Corp. v. Metropolitan Dade County*, 369 So. 2d 679 (Fla. Dist. Ct. App. 1979)(court limited injunctions to completely unconstitutional measures, allowing a partially unconstitutional measure to remain on the ballot); *Utz v. City of Newport*, 252 S.W.2d 434 (Ky. 1952)(Board of Commissioners of Newport was not compelled to submit an unconstitutional act to voters); *Javers v. Council of City of New Orleans,* 351 So. 2d 247 (La. App. 4 Cir. 1977)(city council had discretion to refuse to submit invalid proposal to referendum with court approval); *Montgomery County v. Board of Supervisors of Elections,* 311 Md. 512, 536 A.2d 641 (Md. 1986)(Board of Supervisors of Elections enjoined from placing proposed charter amendments that conflicted with state general laws on the ballot); *State of Missouri v. Smith*, 330 Mo. 252, 48 S.W.2d 891 (Mo. 1932)(city council would not be compelled to submit an unconstitutional eminent domain ordinance to voters); *City of Newark v. Benjamin*, 144 N.J. Super. 58, 364 A.2d 563 (N.J. Super. Ct. Ch. Div. 1976)(city council enjoined from placing a proposed invalid ordinance on the ballot); *Fossella v. Dinkins*, 66 N.Y.2d 162, 485 N.E.2d 1017, 495 N.Y.S.2d 352 (N.Y. 1985)(voters' initiative banning the construction of federal military facility was unconstitutional and not eligible to be placed on the ballot); *Town of Hilton Head Island v. Coalition of Expressway Opponents,* 307 S.C. 449, 415 S.E.2d 801 (S.C. 1992)(court would not compel town to submit a facially defective highway toll ordinance to voters); *Wyoming National Abortion Rights Action League v. Karpan*, 881 P.2d 281 (Wyo. 1994)(proposed abortion statute could appear on the ballot because it was not fully unconstitutional).

> The presence of an invalid measure on the ballot steals attention, time and money from the numerous valid propositions on the same ballot. It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to denigrate the legitimate use of the initiative procedure.

Although the Rhode Island Supreme Court recently declined to issue an Advisory Opinion on the grounds that the Governor did not have standing to seek the opinion, that Court has on a prior occasion acknowledged the public policy considerations associated with presenting the voters with an unconstitutional casino ballot question.[3] The Supreme Court of Rhode Island noted in connection with the 1994 Casino Act, that the issue before the Court was "of great public and constitutional importance." The Court stated:

> The Casino Act calls for placing the referendum question on the statewide ballot . . . If, as we believe, the question and legislation are void as unconstitutional, then the members of the public will waste much money, time, effort, and energy to familiarize themselves with the controversial issues that the proposed casino has raised. This confusion certainly will be intensified by the fact that the Governor and the Attorney General, two general officers of this state, expressly have taken the position that the Casino Act is constitutionally infirm.

*In re Advisory Opinion to the Governor (Casino I)*, *supra,* at 325 (emphasis added). The public policy concerns voiced by the Rhode Island Supreme Court in 2004 are equally true today and support this Court's review of the unconstitutional ballot question.

---

[3] In their memorandum in support of their motion to intervene in this case, Harrah's and the Tribe quote, out of context, a sentence in the Supreme Court of Rhode Island's recent decision that the Governor lacks standing to request the Advisory Opinion. The Supreme Court stated at the end of a paragraph, "Therefore, neither the executive nor judicial branches of the government may interfere with the process of proposing a constitutional amendment." While Harrah's and the Tribe assert that this sentence bars this Court from conducting a pre-election review of the ballot question, the context of the sentence and the first word of the sentence, "therefore," makes it clear that precisely because the Governor has "no present constitutional duty," neither the executive nor judicial branches were presently in a position to interfere with the ballot question. Unlike the Governor seeking an advisory opinion, a real and present case or controversy exists in this case where the plaintiffs seek to avoid irreparable injury. Moreover, in the event that the Advisory Opinion can be read as a broader decision of a state court not to intervene, this Court would be free to intervene without infringing on comity or other deferential concerns.

## II. The Proposed Amendment Violates Plaintiffs' First Amendment Rights.

### A. Freedom of Political Belief and Association.

In addition to plaintiffs' equal protection rights under the Fourteenth Amendment, the proposed amendment is equally offensive to plaintiffs' First Amendment rights.[4] The freedom of political belief and association guaranteed by the First Amendment prevents the State, absent a compelling interest, from "penalizing citizens because of their participation in the electoral process, . . . their association with a political party, or their expression of political views." *League of United Latin American Citizens v. Perry,* 126 S. Ct. 2594, 2634-2635 (U.S. 2006) (citing *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J. concurring)). "These protections embodied in the First and Fourteenth Amendments reflect the fundamental duty of the sovereign to govern impartially." *League of United Latin American Citizens,* 126 S. Ct. at 2635; *accord, e.g., Lehr v. Robertson,* 463 U.S. 248, 265 (1983); *New York City Transit Authority v. Beazer*, 440 U.S. 568 (1979).

In the instant case, Harrah's and the Tribe have been singled out in the West Warwick Resolution to be the recipients of the one and only Rhode Island casino license. While the

---

4 Citing *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933), Harrah's and the Tribe contend in their memorandum in support of intervention that the Town of Johnston lacks standing to press its constitutional claims against the State. Such contention is an overly broad characterization of the law. Although a "municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator," *Williams*, 289 U.S. at 40, these cases are "substantive holdings that the Constitution does not interfere in states' internal political organization." *Rogers v. Brockette*, 588 F.2d 1057, 1069 (5th Cir. 1979). *But see San Diego Unified Port. Dist. v. Gianturco*, 651 F.2d 1306, 1309-10 n.7 (7th Cir. 1981)("While there are broad dicta that a political subdivision may never sue its maker on constitutional grounds, . . . we doubt that the rule is so broad."). However, political subdivisions **may** "sue their states on constitutional grounds when the right asserted is protected." *Santiago Collazo v. Franqui Acosta*, 721 F. Supp. 385, 393 (D.P.R. 1989). Consequently, several courts, including the United States Supreme Court, have recognized that municipal entities and/or other political subdivisions have standing to sue their states. *See, e.g., Board of Educ. v. Allen*, 392 U.S. 236, 241 n.5 (1968)(protection of first amendment rights)(cited with approval in *City of South Lake Tahoe v. California Tahoe Regional Planning Agency*, 449 U.S. 1039, 1041 (White, J., dissenting from denial of certiorari); *Rogers, supra*, 588 F.2d at 1069 (supremacy clause); *San Diego Unified Port. Dist. v. Gianturco*, 457 F. Supp. 283, *aff'd*, 651 F.2d 1306 (7th Cir. 1981)(same). Because the Town of Johnston presents substantial First Amendment claims here, this Court should conclude that it has standing.

proposed constitutional amendment does not mention Harrah's by name, the 2004 Casino Act passed by the same legislature, codified as Chapter 9.1 of Title 44 of Rhode Island General Laws, made no attempt to hide Harrah's involvement as the recipient of the valuable casino license, along with the Tribe.[5] It is no secret that for several years Harrah's and the Tribe have lobbied, supported, crafted and negotiated behind the scenes agreements with various state legislators in an effort to be awarded a no-bid casino license to be located in the Town of West Warwick. Harrah's intervention into this litigation confirms what the proposed amendment fails to disclose – that whether they know it or not, Rhode Island voters are being asked to grant Harrah's a statewide casino monopoly in West Warwick to the exclusion of all other qualified casino operators, cities and towns, including Ajax, Trump and the Town of Johnston.[6]

The grant of the no-bid casino license to Harrah's in the 2004 Casino Act and currently in the proposed amendment to the Rhode Island State Constitution is a preference to Harrah's, the Tribe and the City of West Warwick, and is a direct consequence of their active role in the political and legislative process to legalize casino gaming in Rhode Island over the past several years. The corollary principal is that Ajax, the Town of Johnston, and all other potential casino operators and cities and towns are being penalized for either not participating in the political and legislative process, or for taking a position contrary to Harrah's, the Tribe and legislators who supported the casino initiative in West Warwick.

In *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 276 F.3d. 876 (6th Cir. 2002), *cert. denied*, 536 U.S. 923; (2002) (*Lac Vieux II*),

---

5 Rhode Island General Laws § 41-9.1-5 would have granted Harrah's a ten year master contract to operate the casino in West Warwick.

6 According to a summary released by Harrah's and the Tribe, attached hereto as **Exhibit 1**, the Tribe has a preferred interest of only 5% in the proposed casino operation. The full agreement between Harrah's and the Tribe has not been released to the public.

and in its earlier decision in the same case, 172 F.3d 397 (6th Cir. 1999)(*Lac Vieux I*), the Sixth Circuit Court of Appeals confronted facts that are directly on point. In the *Lac Vieux* decisions, the Sixth Circuit Court of Appeals struck down a City of Detroit ordinance that established how three licenses for the operation of new casinos would be issued. The ordinance "incorporated an advantage for two companies that had been active in the movement to legalize the gambling in the first place." The ordinance rewarded two private companies, Atwater Entertainment Associates, LLC and Greektown Casino, LLC for their efforts during the state and local referenda campaigns. For example, the ordinance includes a "statement of intent" declaring that "it is in the best interest of the City to provide a preference to those developers who took the initiative to facilitate the development of casino gaming in the City of Detroit by proposing a casino gaming proposal approved by the voters of the City, and who actively promoted and significantly supported the State initiative authorizing gaming." Detroit City Code, § 18-13-1(i). Another provision expressly prefers casino developers who, assuming they meet the other eligibility criteria, were "initiators of a casino gaming proposal which was approved by the voters of this City prior to January 1, 1995; and . . . made significant contributions to the development of gaming within the City by actively promoting and significantly supporting a state initiative authorizing gaming." Detroit City Code, § 18-13-6(a)(2). Following passage of the ordinance, the mayor awarded Atwater and Greektown two of the three casino licenses to operate casinos in Detroit.

*In Lac Vieux I*, the Sixth Circuit Court of Appeals reversed the district court's entry of summary judgment against the plaintiffs on their first and fourteenth amendment claims. The Court described the issue presented as follows:

> Lac Vieux presents a facial challenge to the city ordinance and the amended act on the basis that they grant preferences to particular entities as a reward for content-based political speech. Lac Vieux asserts that under . . . First Amendment cases, it need not have

> participated in the competitive bidding process to bring a facial challenge.

172 F.3d at 406 (citations omitted). In reversing the district court, the Sixth Circuit found that Lac Vieux's First Amendment rights were impacted "even if the regulation does not directly prohibit or limit speech." 172 F.3d at 409. "Constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Id.* (*quoting Laird v. Tatum*, 408 U.S. 1, 11 (U.S. 1972)). The Court noted that Lac Vieux's contention was that it was discriminated against for failing to actively promote or significantly support the [gaming] initiatives. The Court stated:

> the government "may not deny a benefit to a person on a basis that infringes his constitutionality protected interests – especially his interest in freedom of speech. . . .
>
> Although the city ordinance in this case does not directly prohibit or limit speech, it does implicate the First Amendment. The ordinance grants benefits and imposes burdens according to whether an individual or entity sufficiently supported a particular political issue. Specifically, it grants a preference to developers who initiated a prior local casino gaming proposal and "actively promoted and significantly supported a state initiative authorizing gaming." Detroit City Code § 18-13-6. The ordinance thereby denies a preference in the bidding process to certain developers on the basis of the content of their political speech, a category of speech which has been specifically recognized by the Supreme Court as particularly valuable and thereby carefully protected. It does not matter that the ordinance involves prior speech rather than prospective speech or a preference rather than a guarantee, because it imposes a burden based on the content of political speech and, therefore, implicates the First Amendment.

172 F.3d at 409 (citations omitted).

In *Lac Vieux I,* the Sixth Circuit determined that the plaintiff had standing to assert First and Fourteenth Amendment claims. Reversing the district court's decision that the First Amendment was not implicated, the Sixth Circuit remanded the case for a determination as to

whether the City of Detroit could prove a compelling state interest in order to meet the strict scrutiny test resulting both from the First Amendment and Equal Protection claims. As to the First Amendment claim, the Sixth Circuit concluded that the ordinance was "content based" and that strict scrutiny review was appropriate. *Id.* at 409; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-383 (1992). In addition, in analyzing plaintiff's Equal Protection claim, the Sixth Court similarly concluded that because a fundamental right (free speech) was impacted, strict scrutiny review was again required.

Upon remand, the district court again sustained the Detroit ordinance, leading to a second appeal to the Sixth Circuit in *Lac Vieux II*, in which the Court reviewed the strict scrutiny analysis that was conducted by the district court in sustaining the ordinance. In *Lac Vieux II*, the Sixth Circuit accepted Detroit's assertion that the ordinance served a compelling governmental interest by promoting the stability of Detroit's political and tax systems, and that those interests were compelling under the First Amendment. *Lac Vieux II* at 879. However, the Court went on to consider whether the ordinance was **necessary** in order for the interests to be served at all. As to the First Amendment issue, the Court examined whether the ordinance was the **least restrictive** possible way of serving those interests. The Sixth Circuit held that the preference given to Atwater and Greektown could not be justified and the ordinance was therefore invalid. The Sixth Circuit concluded that:

> By employing the preference, Detroit basically sought to end the high-stakes competition for two of the three Detroit casino licenses before it really began. This we cannot allow. Barring governments from endorsing or punishing political activity, or the lack of it, is among the paramount functions of the First Amendment's Free Speech Clause. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982) ("Expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'") (*quoting in part Carey v. Brown*, 447 U.S. 455, 467, 65 L. Ed. 2d 263, 100 S. Ct. 2286

> (1980)); *see also Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573, 132 L. Ed. 2d 487, 115 S. Ct. 2338 (1995) ("One important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'") (*quoting in part Pacific Gas & Electric Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 16, 89 L. Ed. 2d 1, 106 S. Ct. 903 (1986) (plurality opinion)).

*Id.* at 880.

The case before this Court is remarkably similar to the facts presented to the Sixth Circuit in *Lac Vieux*. The attempted award of the casino license to the Tribe and Harrah's via a constitutional amendment, with the concomitant requirement that the casino be located in West Warwick, is an impermissible preference that implicates the plaintiffs' First Amendment and Equal Protection rights. The Court must apply a strict scrutiny analysis in determining whether the proposed constitutional amendment is valid.

**B. <u>The First Amendment Right to Participate in the Political Process.</u>**

The right to petition the government for redress of grievances guaranteed by the First Amendment encompasses the fundamental right to participate in the political process. *See Evans v. Romer*, 854 P.2d 1270 (Colo. 1993), *aff'd on subsequent appeal*, 882 P.2d 1335 (Colo. 1994), *aff'd on other grounds*, 517 U.S. 620 (1996).

In *Evans*, the Colorado Supreme Court, following established precedent of the United States Supreme Court, held that "the Equal Protection Clause of the United States Constitution protects the fundamental right to participate equally in the political process," and "any legislation or state constitutional amendment which infringes on this right by 'fencing out' an independently identifiable class of persons must be subject to strict judicial scrutiny." 854 P.2d at 1282. Although a fundamental right to participate in the political process has not explicitly been identified by the United States Supreme Court, such a right is gleaned from prior Supreme Court

decisions relating to preconditions on the right to vote, reapportionment, candidate eligibility and voter initiated amendments preventing enactment of certain types of legislation. *See id.* at 1278. Moreover, while the United States Supreme Court affirmed *Evans* on other grounds, it did not reject the proposition of a fundamental right to participate equally in the political process as articulated by the Colorado Court. *See Citizens for Equal Protection, Inc. v. Bruning*, 368 F. Supp. 2d 980, 994 (D. Neb. 2005) (United States Supreme Court in *Romer* did not reject proposition that fundamental right to participate in political process was protected under First Amendment), *rev'd and remanded,* 2006 U.S. App. LEXIS 17723 (8th Cir. Neb. July 14, 2006). Indeed, as the *Evans* court noted:

> the "fundamental right to participate equally in the political process" can be impinged by a state constitutional amendment that "alters the political process so that a targeted class is prohibited from obtaining legislative, executive or judicial protection or redress from discrimination absent the consent of a majority of the electorate through the adoption of a constitutional amendment."

*Id.* at 1282 (citations omitted).

The West Warwick Resolution impermissibly bestows upon a single, private, for-profit business entity, a constitutionally protected exclusive right and privilege to own and operate a resort casino within the State of Rhode Island, while simultaneously forever "fencing out" Ajax and all other similarly situated parties who desire to own and operate a resort casino within the State of Rhode Island. Moreover, because the Amendment mandates that the casino is to be located in the Town of West Warwick, plaintiff, the Town of Johnston, and all other cities and towns within the State who desire to host a resort casino are similarly fenced out. The West Warwick Resolution virtually strips plaintiffs, and those like them, of their guaranteed right under the United States Constitution to seek redress through legislation or through judicial intervention for this legislatively created permanent denial of any opportunity to own and operate a casino in

Rhode Island, and thus infringes upon the fundamental right to participate equally in the political process.

A legislative enactment which infringes on a fundamental right . . . is constitutionally permissible only if it is "necessary to promote a compelling state interest," *Evans,* 854 P.2d at 1341-1342 (*quoting Dunn v. Blumstein*, 405 U.S. 330, 342 (1972)), and does so in the least restrictive manner possible. *See Plyler v. Doe*, 457 U.S. 202, 217 (1982) ("laws that impinge upon the exercise of a 'fundamental right'[require] the State to demonstrate that its classification has been precisely tailored to serve a compelling government interest.").

### C. First Amendment claims result in strict scrutiny review and an <u>assumption that irreparable harm exists.</u>

#### 1. <u>Strict Scrutiny Review.</u>

Because the West Warwick Resolution infringes the first amendment rights to participate in the political process and the fundamental right to freedom of speech, its constitutionality must be analyzed under the strict scrutiny standard of review. *See Carey v. Brown*, 447 U.S. 455, 461-62 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."). Because there exists no compelling state interest that could possibly justify (i) granting an exclusive right and privilege of owning and operating a resort casino in Rhode Island to a private gaming company without due regard to alternative proposals that are potentially far more advantageous to the State, or (ii) granting the right to host such a casino to a particular town without due regard to the existence of other potentially superior sites, the West Warwick Resolution is clearly impermissible.

Moreover, even if a compelling state interest could be found to exist, it is inconceivable that the West Warwick Resolution could be viewed as the least restrictive way of serving that interest. Whatever interest, compelling or not, that the state may have in allowing a non-state owned resort casino within the state certainly can be met through an amendment that does not limit the right to own and operate such a casino to a pre-selected entity while excluding all other possible participants. *Lac Vieux II, supra*, 276 F. 3d at 879-880.

**2. When the First Amendment is Implicated Irreparable Harm is <u>Presumed</u>.**

Although a moving party generally must demonstrate the probability of irreparable harm in order to be entitled to injunctive relief, the United States Supreme Court has held that where First Amendment rights of association are involved, injunctive relief is clearly appropriate. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373; *see also New York Times Co. v. United States*, 403 U.S. 713 (1971); *Feliciano v. Gaztambide,* 836 F.2d 1 (1st Cir. 1987); *Giron v. Ruiz*, 834 F.2d. 238 (1st Cir. 1987); *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1148 (9th Cir. 1998); *Christian Legal Society v. Walker*, 2006 U.S. App. Lexis 17103 (slip op. at p.9)(7th Cir. July 10, 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest"); *Blue Moon Entertainment, LLC v. City of Bates*, 441 F.3d 561, 565 (8th Cir. 2006).

In the present case, because the plaintiffs' First Amendment Rights are plainly implicated, they are presumed to be in danger of suffering irreparable harm.

## III. <u>There is no abstention doctrine that applies to this case.</u>

Defendants Tribe and Harrah's have suggested that this Court should not involve itself in the instant dispute for reasons of "comity," thereby apparently contending that some sort of abstention is required. Although the defendants have yet to refer to any specific abstention doctrine, the plaintiffs anticipate that the defendants may invoke abstention under *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941). Regardless of which abstention doctrine the defendants may potentially invoke, as this Court aptly noted two years ago in *Southern Union Co. v. Lynch*, 321 F. Supp. 2d 328, (D.R.I. 2004), abstention "is 'an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it,' and should only be invoked in 'exceptional circumstances.'" *Id.* at 335 (*quoting Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)); *see also Cruz v. Melecio*, 204 F.3d 14, 25 (1st Cir. 2000)(presence of federal issue is always major consideration weighing against surrender of federal jurisdiction). In this case, no such extraordinary circumstances are present.

Under *Pullman*, abstention may be appropriate in the following exceptional circumstance:

> When a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide state courts an opportunity to settle the underlying state law question and thus avoid the possibility of unnecessarily deciding a constitutional question.

*Harris County Comm'rs Court v. Moore*, 420 U.S. 77, 83 (1975). In the First Circuit, courts examine two factors to evaluate the applicability of *Pullman* abstention: "(1) whether there is a substantial uncertainty over the meaning of the state law at issue; and (2) whether a state court's clarification of the law would obviate the need for a federal constitutional ruling." *Ford Motor Co. v. Meredith Motor Co.*, 257 F.3d 67, 71 (1st Cir. 2001).

In this case, there is no uncertain state law at issue. The meaning of the West Warwick Resolution is plain, and no party seeks a clarification of any portion of the proposed amendment in connection with the constitutional issues that Plaintiffs have raised. Moreover, there is no clarification by the state court that would obviate the need for a federal constitutional ruling. Even if a state court were to clarify the proposed amendment, such clarification would not avoid the need for this Court to decide whether the West Warwick resolution violates the federal constitution. Accordingly, it is clear that there exist no exceptional circumstances warranting abstention in this case.

**IV. Standards for Preliminary Injunctive Relief.**

**The Standard For Granting A Preliminary Injunction**

Generally, in the First Circuit, in evaluating whether to grant a preliminary injunction, the Court considers four well-known factors: (i) the moving party's likelihood of success on the merits; (ii) whether there is a substantial risk that the moving party will suffer irreparable harm in the absence of an injunction; (iii) whether such risk of harm outweighs the risk to the non-moving party; and (iv) whether the granting of an injunction will not adversely affect the public interest. *See e.g., Biogen Idec MA, Inc. v. Trustees of Columbia Univ.*, 332 F. Supp. 2d 286, 295 (D. Mass. 2004). Despite the familiar factors, however, their application in a particular matter is fluid rather than rigid, such that the various factors must be "weighed *inter sese* [among themselves]," *Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953, 958 (1st Cir. 1983), and evaluated subject to a "sliding scale" analysis, *Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1232 (1st Cr. 1993) *cert. denied sub nom. Massachusetts v. Gately,* 511 U.S. 1082 (1994). Accordingly, it is impermissible for the Court to evaluate any of the factors in a vacuum. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Indeed, "the predicted

harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Id.* Consequently, "when the likelihood of success on the merits is great, **a movant can show somewhat less** in the way of irreparable harm and still garner preliminary injunctive relief." *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir. 1996)(emphasis added); *see also Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)("Simply stated, more of one excuses less of the other.").

As set forth above, because plaintiffs allege violations of their First Amendment rights, the loss of First Amendment freedoms is presumed to result in irreparable harm. *Feliciano, supra,* 836 F.2d at 1. Even without the First Amendment presumption of irreparable injury, although a moving party must make some showing of irreparable harm, the First Circuit cautions not to "overstate [the] dimensions" of the required burden. *Ross-Simons*, 102 F.3d at 19. Therefore, to establish irreparable harm, "a plaintiff need not demonstrate that the denial of the injunctive relief will be fatal to its business." *Id.* "It is usually enough if the plaintiff shows that its **legal remedies are inadequate**." *Id.* (emphasis added). Consequently, if "the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Id.*[7]

**<u>Likelihood of Success and Risk of Harm in this Case</u>**

**(Likelihood of Success/Fourteenth Amendment Claim)**

Applying the standards for injunctive relief to the instant case, it is clear that plaintiffs are entitled to an injunction preventing the West Warwick referendum question from appearing on the November ballot. First, plaintiffs are able to demonstrate a strong likelihood that they will prevail

---

7 On the other hand, plaintiffs concede that a "finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004), and that "a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm.'" *Ross-Simons*, 102 F.3d at 19.

on the merits of their claim that the proposed amendment denies equal protection in violation of the Fourteenth Amendment to the federal constitution. In this regard, the proposed amendment clearly engages in a suspect classification by granting a preference, indeed creating a monopoly, in favor of Native Americans by specifically selecting the Tribe as the sole entity (along with "its chosen partner") having the right to form the business that will own and operate the casino. Moreover, such a suspect classification plainly cannot withstand strict scrutiny, in that there is no narrowly tailored compelling state interest that such classification serves. To the contrary, the State of Rhode Island neither has a compelling interest in conferring benefits upon a single Native American group (only the federal government does), nor does the pre-selection of the Tribe accomplish any such goal in the least restrictive fashion. Rather, the unique selection of the Tribe not only excludes all private entities (such as Ajax) from seeking to own or operate a casino in Rhode Island, it also excludes all other Native American Groups.[8] Under the circumstances, it is patently clear that the proposed amendment violates the Fourteenth Amendment.

With respect to the merits of the equal protection claim, plaintiffs rely on their previously submitted memorandum in support of temporary restraining order and preliminary injunction. However, in addition to the cases cited therein, the following three cases also support plaintiffs Fourteenth Amendment claim. In *Malabed v. North Slope Borough,* 42 F. Supp. 2d 927 (D. Alaska 1999), *aff'd,* 335 F.3d 864 (9th Cir. 2003), the federal district court invalidated on equal protection grounds a local government employment preference to hire Native Americans for all borough jobs. Following the district court's decision, but prior to considering the defendants'

---

[8] Even if this Court were to apply the more deferential rational means standard, the pre-selection of the Tribe is not reasonably related to the furtherance of a legitimate State objective in that (i) a preference for a Native American group is a uniquely federal, not state, objective; (ii) the Tribe, with respect to gambling on non-tribal lands in Rhode Island, stands in the same shoes as any private entity, and as such its pre-selection is arbitrary; and (iii) the proposed amendment engages in an arbitrary classification in that it does not base pre-selection of the owner/operator on any objective criteria such as qualification or fitness of the license holder or whether the propose casino will generate the most revenue for the taxpayers.

appeal, the Ninth Circuit certified to the Alaska Supreme Court the question of whether the employment preference violated state law. In *Malabed v. North Slope Borough*, 70 P.3d 416 (Alaska 2003), the Alaska Supreme Court invalidated the law on the basis of the Alaska State Constitution's equal protection clause. Thereafter, the Ninth Circuit affirmed the district court's judgment on other grounds – the state constitutional violation as determined by the state supreme court. *Malabed,* 335 F.3d 864 (9th Cir. 2003).

*In Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), the United States Supreme Court held that a preference granted to "socially and economically disadvantaged individuals," including Native Americans, among others, must be analyzed under strict scrutiny. *Id.* at 218-235. The Court held that all racial preferences imposed by any government (federal, state, or local) must be analyzed under strict scrutiny. *Id.* at 235. The particular preference in issue awarded prime contractors on United States Department of Transportation projects additional compensation if they subcontracted with certain minority-owned businesses. These included businesses owned by "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans," and other minorities. The Court held the same standard must apply to all and could not be dependent upon a particular individual's race regardless of whether the classification at issue presented a burden or a benefit. *Id.* at 218-235.

In *Tafoya v. City of Albuquerque*, 751 F. Supp. 1527 (D.N.M. 1990), the federal district court analyzed an ordinance which restricted licenses to sell goods to "New Mexico residents who are members of the Navajo Nation or of a federally recognized Indian tribe or pueblo." In invalidating the ordinance, the Court noted that unlike Congress, the City of Albuquerque had no constitutional mandate to advance the interests of Native Americans as opposed to the interests of all other citizens. *Id.* at 1530. In addition, the Court stated that Albuquerque had no constitutional

authority to enact remedial ordinances purportedly designed to cure the perceived effects of past societal discrimination against the Navajo. *Id.* The Court analyzed the ordinance using strict scrutiny and found that the City of Albuquerque had failed to demonstrate any compelling interest justifying the Ordinance. The Court also found that there was no factual predicate to suggest that the Ordinance remedied past discrimination as to licensing in Old Town and the Ordinance was not narrowly tailored to cure such identifiable discrimination. *Id.* at 1531. Having failed to meet the stringent requirements of strict scrutiny, the Ordinance was deemed unconstitutional in its entirety.

**(Likelihood of Success/First Amendment Claims)**

As an alternative grounds for succeeding on the merits, the plaintiffs have demonstrated compellingly that their First Amendment rights have been violated. Because the proposed amendment to the State Constitution is content-based, the Court should apply a strict scrutiny analysis. As argued alone, there is no compelling state interest under the present facts. However, even if a compelling state interest could be found, it is not necessary to grant the monopoly to Harrah's, with a mere 5% interest to the Tribe, in order to serve any such compelling state interest. Moreover, the proposed amendment is certainly not the least restrictive possible way of serving any legitimate state interest. *See Lac Vieux I and II, supra.* Plainly, plaintiffs' First Amendment right to participate in the political process is threatened by the constitutional amendment. That allegation alone is enough to trigger the same strict scrutiny review, which the state simply cannot overcome under the facts of this case.

**(Showing of Irreparable Harm)**

With regard to the requirement that plaintiffs demonstrate the risk of irreparable harm, plaintiffs have met their burden through their strong showing that they will succeed on their First

Amendment claims, which showing results in a presumption of irreparable harm. *Feliciano, supra.* Moreover, even though the foregoing great likelihood of success lessens plaintiffs' burden of showing irreparable harm, even without the presumption resulting from the First Amendment claims, it is clear that plaintiffs have made a substantial showing that they have no adequate remedy at law. In this regard, in the absence of an injunction preventing the proposed referendum question from appearing on the ballot, Ajax (i) will be forced to relinquish its rights in the Johnston Purchase Agreement; (ii) will lose its commitment from its investors to develop a casino in Johnston; and (iii) will be unable to maintain its contractual and advantageous business relations with its business partner (Trump). (Affidavit of David H. Nunes, previously submitted to the Court, hereafter "Nunes Affidavit") ¶¶ 9-16). Furthermore, there is a genuine and substantial risk (i) that if the voters are allowed to vote on the West Warwick Resolution, even if that referendum is defeated or if a court later declares the proposed casino amendment to be unconstitutional, they would react negatively in the future and would reject any casino gaming proposal (even if constitutional); and (ii) that the mere appearance on the statewide ballot of a question that proposes to grant gaming rights to the Narragansett Indians for a casino to be located in the Town of West Warwick (a) will be perceived by the voters as an endorsement by the State Legislature of the Tribe and West Warwick; and (b) that such an endorsement will give an unfair advantage to the Tribe and the Town in any future legislation or voter ballot question. (Nunes Affidavit, ¶¶ 17-18). Accordingly, if the Court allows the West Warwick Resolution to be placed on the ballot, Ajax's ability to pursue a valid and constitutional casino in Johnston will sustain irreparable injury. Under the circumstances, this Court should enjoin the proposed ballot question.[9]

---

9 Likewise, the Town of Johnston's interests in establishing a casino in that Town will be similarly eradicated in the absence of the requested injunctive relief.

## *Conclusion*

Based upon all of the foregoing, this Court should grant Plaintiffs' motion for the issuance of a preliminary injunction and should restrain and enjoin Defendant Matthew Brown, in his capacity as Secretary of State for the State of Rhode Island, from taking any action to cause the question of whether to approve an amendment to the Rhode Island Constitution, as proposed in General Assembly Joint Resolution No. H 7935/Sub A, to be placed on any statewide or local ballot for the November 2006 General Election. The voters of Rhode Island should be spared from educating themselves and voting on an amendment that violates the United States Constitution. Moreover, entry of a preliminary injunction will avoid irreparable harm to both Ajax and the Town of Johnston, both of whom favor a fair and open ballot question on casino gaming.

Respectfully submitted,

AJAX GAMING VENTURES, LLC and
THE TOWN OF JOHNSTON,

By their Attorneys,

SHECHTMAN HALPERIN SAVAGE, LLP

/s/ *Preston W. Halperin, Esquire*
/s/ *Douglas A. Giron, Esquire*
Preston W. Halperin, R.I. Bar No. 5555
Douglas A. Giron, R.I. Bar No. 2943
1080 Main Street
Pawtucket, RI 02860
(401) 272-1400
(401) 272-1403 (fax)

Dated: August 2, 2006

EXHIBIT
ALL-STATE LEGAL®
1

7-17-06

TERMS OF AGREEMENT
NARRAGANSETT INDIAN TRIBE/HARRAH'S ENTERTAINMENT
OPERATING AGREEMENT FOR
NARRAGANSETT INDIAN CASINO

1. The Company. On August 26, 2005, Harrah's West Warwick Investment Company, LLC ("HWWIC") and The Narragansett Indian Tribe (the "Tribe") entered into a Limited Liability Company Operating Agreement (the "Operating Agreement") forming Narragansett Tribe/Harrah's Casino Project Company, LLC (the "Company").

2. Rights of the Company. The Company will have all the rights, title and interests and enter into all arrangements for the West Warwick Casino.

3. Members of the Company. HWWIC and the Tribe are the sole members of the Company. HWWIC is the managing member.

4. Tribe Rights in Casino Development, Operation and Management

(a) Advisory Board and Design Subcommittee. The Company has an Advisory Board and Design Subcommittee that advise the managing member regarding the development, operation, management, expansion and other matters relating to the Casino Project.

(b) Hiring and Management Training Subcommittee. The Company has an obligation to establish a Owner Hiring and Management Training Subcommittee to formulate polices and programs for employment and vendor opportunities for members of the Owner. This Subcommittee is required to develop policies and programs for (i) Tribal subcontractors, Tribal equipment vendors and other Tribal vendors and providing preferences for such vendors who are equally or more qualified than other vendors, and (ii) preferences in hiring and promotion of owner members of the Company who are equally or more qualified than other applicants.

5. Preferred Distributions to the Tribe. The Tribe's membership interest is entitled to a preferred distribution (before operating expenses) of 5% of Adjusted Gross Revenues (Gross Revenue less gaming taxes). This percentage is adjusted to 5.5% of Adjusted Gross Revenue if Adjusted Gross Revenue exceeds $800 million and EBITDA exceeds 24% of Adjusted Gross Revenues. This percentage is further adjusted to 6% of Adjusted Gross Revenue if Adjusted Gross Revenue exceeds $1 billion and EBITDA exceeds 26% of Adjusted Gross Revenues.

6. Additional Payments to the Tribe.

(a) Health Fund. HWWIC is required to distribute $300,000 to the Tribe for a Health Fund on the date of commencement of construction and thereafter to make an annual distribution of $75,000 to the Health Fund. If EBITDA exceeds $125 million, the annual contribution is increased to $100,000. The Health Fund is to be used for general health care and disease prevention, health education, health facilities and any other needs related to the health of members of NIT, as determined by NIT.

(b) Education Fund. HWWIC is required to distribute $300,000 to the Tribe for an Education Fund on the date of commencement of construction and thereafter to make an annual distribution of $75,000 to the Education Fund. If EBITDA exceeds $125 million, the annual contribution is increased to $100,000. The Education Fund is to be used for early education, parent training, school facilities and operations, assistance with elementary school, middle school, high school, college preparatory, college, and graduate educations, and any other needs related to the education of the members of NIT, as determined by NIT.

7. Reimbursements. The Tribe has no obligation to reimburse the Managing Member for any funds advanced by the Managing Member for Casino Project Costs.

8. Purchase Option. The Tribe may exercise an option to purchase the Company commencing 15 years after opening of the Casino project.